# Federal "Non-Reserved" Water Rights

[The following memorandum of law deals with the scope of the federal government's rights to unappropriated water flowing across federally owned lands in the western states It discusses the background and development of the federal "non-reserved" water rights theory, and concludes that that theory does not provide an appropriate legal basis for a broad assertion of water rights by federal agencies without regard to state laws. It then sets forth the legal standards and considerations that are applicable to an analysis of federal water rights in connection with the management of particular federal lands under specific statutes authorizing federal land management.]

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Introduction | 329 |
| II. | Background | 333 |
| | A. Development of "Appropriative" Water Rights in the Western States | 334 |
| | B. Role of the Federal Government | 338 |
| | (1) Federal ownership of western lands | 338 |
| | (2) Congressional recognition of state water law | 341 |
| | (3) Judicial recognition of federal water rights | 345 |
| | (a) Federal reserved rights | 346 |
| | (b) Conflicts with congressional directives | 351 |
| | (c) Administrative practice and interpretations | 355 |
| | (i) Krulitz Opinion | 356 |
| | (ii) Martz Opinion | 360 |
| | (iii) Coldiron Opinion | 360 |
| III. | Analysis | 362 |
| | A. Constitutional Basis for Federal Claims | 362 |
| | (1) Congressional authority to preempt state water laws | 362 |
| | (2) "Ownership" of unappropriated water | 364 |
| | (3) Effect of Mining Acts of 1866 and 1870 and Desert Land Act | 367 |
| | B. Statutory Basis for Federal Claims | 370 |
| IV. | Conclusion | 383 |

## MEMORANDUM FOR THE ASSISTANT ATTORNEY GENERAL, LAND AND NATURAL RESOURCES DIVISION

### I. Introduction

You have asked us for our analysis and legal opinion concerning the federal government's legal rights to unappropriated water arising on or flowing across federally owned lands in the western states. Specifically, you have asked us to consider whether the federal government can assert rights to unappropriated water, without regard to state laws governing the use of such water, under what has come to be known as the federal "non-reserved" water rights theory. For the reasons set forth in detail in this opinion, we conclude that the federal non-reserved water rights theory which we address in this opinion does not provide an appropriate legal basis for assertion of water rights by federal agencies in the western states.

The question presented to us arose in your Division in pending litigation in Wyoming State court involving, *inter alia*, rights of the United States Department of Agriculture, through the Forest Service, to water in the Big Horn and Shoshone National Forests. The question presented to us initially was whether an appropriate legal basis exists for the Forest Service to assert amended claims in that litigation based on the federal non-reserved water rights theory. At that time the Forest Service supported assertion of such claims, at least for the purposes of the Wyoming litigation. The Department of Agriculture has since changed its position and decided as a matter of policy that it will not assert claims based on the non-reserved water rights theory, but rather will rely on state law to obtain water rights, except where Congress has specifically established a water right or where a federal reserved right exists. *See* Letter from John B. Crowell, Jr., Assistant Secretary for Natural Resources and Environment, Department of Agriculture, to the Honorable David H. Leroy, Attorney General, State of Idaho (Feb. 5, 1982).

While the question of the validity of the federal non-reserved water rights theory arose in the relatively narrow context of the Wyoming litigation, it is a

question that has created considerable uncertainty for you and your client agencies (the Departments of the Interior, Agriculture, and Defense), and for the western states. It is no exaggeration to say that water is the single most vital resource in the western states. The importance of the availability of water for management of federal lands in the western states and concern at the state level with allocation of dwindling water resources have led in the past to conflicts within the Executive Branch and intense controversy with the western states over the basis and scope of the federal government's right to use unappropriated water arising on or flowing across federal lands. Previous Executive Branch positions relative to federal government claims to water in the western states have been inconsistent and have produced confusion, turmoil, and significant hostility toward the federal government.[1] The need to establish clear, dependable, reliable, and sound legal policies and to avoid conflicts and uncertainty in the western states to the extent possible, and to facilitate future planning for the use of water resources by both the western states and the responsible federal agencies has led you to ask this Office to address the matter more broadly.

We address here only the legal issues raised by the federal non-reserved water rights theory. Some uncertainty may persist as to how the legal principles we outline here should be applied to specific factual situations. Policy considerations will also continue to be important, for example, in the determinations by federal agencies relative to the breadth of permissible rights which they wish to assert or in the choice of procedures and forums in which to adjudicate federal water rights, and quantification of current and future water rights may have to await comprehensive adjudications in each state. However, because much of the uncertainty has been created by contradictory analyses of the legal basis of the federal non-reserved right theory, a comprehensive resolution of the legal issues involved will go far toward reducing the uncertainty and therefore the tensions among the various federal agencies and between the Executive Branch and the western states.

At the outset, it is important to understand what we address in this opinion. First, we are concerned here only with the federal government's right to use unappropriated water—i.e., water that is not subject to any vested right of ownership under applicable state or federal law at the time the federal right accrues. We do not deal here with the scope of the federal government's right to acquire, by purchase or condemnation, existing vested ("appropriated") water rights held by private individuals or by the states. Second, the question we address is not simply whether a federal non-reserved right exists in the abstract. The federal government can, and does, acquire rights to use unappropriated water on federal lands by complying with state procedural and substantive laws. In

[1] The Attorney General for the State of Wyoming has stated, for example, that "the non-reserved right doctrine creates a nightmare for Western States' water resources management." Letter from the Honorable Steven F. Freudenthal, Attorney General, State of Wyoming, to Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (Apr. 1, 1982) The Montana Attorney General has suggested that failure to resolve the non-reserved water rights dispute would lead to "a long and acrimonious confrontation between the federal and state governments." Memorandum from the Honorable Mike Greely, Attorney General, State of Montana, to Theodore B Olson, Assistant Attorney General, Office of Legal Counsel (Apr 1, 1982) at 12.

addition, the Supreme Court has recognized federal "reserved" water rights—
*i.e.,* when the federal government, acting pursuant to congressional authoriza-
tion, reserves or withdraws public land for a specific federal purpose, such as a
national forest, it also reserves sufficient water to accomplish that purpose,
regardless of limitations that might otherwise be imposed on the use of that water
under applicable state law. *See* Part IIB(3)(a) *infra.* In its broadest formulation, a
federal non-reserved water right might include any use by the federal government
of unappropriated water that is recognized neither under applicable state law nor
under the reserved right doctrine. Defined this broadly, federal non-reserved
water rights would include even uses of water that have been explicitly authorized
by Congress, but that may not be recognized by state law, such as preservation of
a minimum instream flow in a particular river,[2] or diversion of a stream and
construction of a dam for flood control, improvement of navigation, or produc-
tion of hydroelectric power.[3] Although Congress has rarely been explicit in
directing the use or disposition of water by federal agencies, there is no question
that, by operation of the Supremacy Clause, such a specific directive preempts
inconsistent state laws. *See* discussion in Part IIIA(1) *infra.* As we discuss below,
a legal basis may therefore exist under particular federal statutes for assertion of
federal water rights that do not fall into the category of either reserved or state-
recognized rights, and that might conceivably be classified as "non-reserved"
water rights simply because they do not stem from the reserved doctrine.

This is not to say, however, that an appropriate legal basis exists for the federal
non-reserved water rights *theory,* as it has been articulated by, among others,
former Solicitor Leo Krulitz of the Department of the Interior. It is this theory that
we address here. In his June 25, 1979, opinion on the legal bases for acquisition
of water rights by the Department of the Interior, Solicitor Krulitz concluded that,
in the absence of an explicit congressional directive to the contrary, a federal
agency may claim and use whatever unappropriated water is necessary to carry
out congressionally authorized "management programs" for federal lands, with-
out regard to state law. *See* Part IIB(3)(c)(i) *infra.* Solicitor Krulitz's theory of
federal non-reserved water rights rested on the presumption that the federal
government need not comply with state water law in its acquisition and use of
water for federal purposes on federal lands—a presumption that could be rebutted
only by an explicit statutory directive that the federal agency responsible for
management of the federal lands in question abide by state law in the use,
appropriation, or distribution of water on those lands. Thus, under this theory, in
the absence of such a directive a federal agency may use whatever unappropriated
water is necessary to carry out its land management functions without regard to
state law.[4]

---

[2] *See, e.g.,* 16 U S.C. § 577b (1976) (prohibiting any "further alteration of the natural water level of any lake or
stream" in the Lake Superior National Forest).

[3] *See, e g., Oklahoma* v. *Guy F Atkinson Co ,* 313 U.S. 508, 535 (1941), *First Iowa Coop.* v *Federal Power
Comm'n,* 318 U.S. 152, 176 (1946), discussed in Part IIB(3)(b) *infra*

[4] As we discuss in Part IIB(3)(c)(i) *infra,* Solicitor Krulitz concluded that federal agencies are immune from both
substantive and procedural state law, but recommended as a matter of policy that the agencies comply with state
procedures wherever possible

331

We conclude that the broad federal non-reserved water rights theory asserted by Solicitor Krulitz is not supported by an analysis of the applicable statutes and judicial decisions. As we discuss below, to the extent Solicitor Krulitz relies on federal ownership of unappropriated water in the western states as a basis for federal rights to water, that reliance is misplaced. More importantly, when the question is considered as one of competing state and federal regulatory jurisdiction, rather than ownership of the water—as we believe it must—Solicitor Krulitz's opinion fails to give adequate consideration to the pattern of congressional deference to state water law, which the Supreme Court has recognized as critical in analyzing federal rights to water on federal lands. *See California* v. *United States,* 438 U.S. 645, 648–63 (1978); *United States* v. *New Mexico,* 438 U.S. 696, 701–02 (1978).

We believe that the history of federal-state relations with respect to water rights in the western states and Congress' weighing of the competing federal and state interests establish a presumption that is directly opposite to that asserted by Solicitor Krulitz: in the absence of evidence of specific congressional intent to preempt state water laws, the presumption is that federal agencies can acquire water rights only in accordance with state law. The mere assignment of land management functions to a federal agency, without more, does not create any federal rights to unappropriated water necessary to carry out those functions.

It is important to keep in mind, however, that this presumption is rebuttable. There is no question that the federal government has the constitutional authority to acquire rights to whatever water is necessary to manage federal lands, either through purchase or condemnation of existing water rights or by clear congressional action. The critical question is what evidence of congressional intent is necessary to rebut the inference that state law is controlling. The Supreme Court has addressed that question in its recent decisions in *California* v. *United States* and *United States* v. *New Mexico,* albeit in limited contexts. We believe that the Court's reasoning in those two cases provides the relevant framework for analysis here. Read together, those cases suggest that congressional intent to preempt state control over unappropriated water in the western states will be found only if conditions imposed under state law on the use or disposition of water by a federal agency conflict with specific statutory directives authorizing a federal project or directing the use of federal lands, or if application of state law would prevent the federal agency from accomplishing specific purposes mandated by Congress for the federal lands in question. The scope of the federal rights that may be asserted under those circumstances is limited to water minimally necessary to carry out the relevant statutory directives or purposes.

Although we believe that the water rights that can be asserted by federal agencies without regard to state law are far more limited than those available under Solicitor Krulitz's non-reserved water rights theory, we do not believe it is appropriate to reach a blanket conclusion that under existing federal statutes no implied federal water rights exist except for reserved rights. The reasoning used by the Supreme Court to support federal reserved rights does not depend solely on a formal reservation of land from the public domain, but rather on Congress'

exercise of a constitutional authority such as the Property or Commerce Clauses, coupled with the Supremacy Clause. Therefore, that reasoning is applicable even if there has been no such reservation. We believe, for example, that the Court's decision in *United States* v. *New Mexico* is equally applicable to water necessary to fulfill the primary purposes of a federal statutory scheme where the lands in question have been acquired by the federal government from private ownership, rather than reserved from the public domain, and dedicated to particular federal purposes, such as a national forest, park, or military base. *See* Part IIIB *infra*. We also believe that it is open to federal agencies to argue that Congress has established particular mandatory purposes for the management of public domain lands that would be frustrated by the application of state water law, although, as we discuss below, the primary federal statutes authorizing management of the public domain appear to provide little basis for that argument. The *New Mexico* decision leaves virtually no room for arguing, however, that federal agencies can appropriate water without regard to state law if that water is necessary only to carry out a "secondary use" of federal lands, in the terminology of the Court in *New Mexico—i.e.*, an incidental or ancillary use that is permitted by Congress, but not within the primary purposes mandated by Congress for the federal lands in question.

The scope of the federal government's rights to unappropriated water for use in the management of specific federal lands in the western states, whether characterized as "reserved" or "non-reserved," can be definitively determined only by a careful examination of the individual federal statutes that authorize management of those lands and their legislative history, and of the potential conflicts that may be created by application of state laws. We cannot undertake that analysis here with respect to all federal statutes governing the use of federal lands, but must leave that task, at least initially, to the individual agencies responsible for administration of those statutes. We outline in this opinion, to the extent possible, the legal standards and considerations that are applicable to that analysis, and the bases for our conclusions.

## II. Background

The rights of the federal government to use water in the western states cannot be analyzed solely as a question of abstract constitutional or statutory interpretation. *See California* v. *United States, supra,* 438 U.S. at 648. The unique geography, history, and climate of the western states and the ownership by the federal government of substantial land within those states have shaped many of the relevant questions and conclusions. In order to analyze the scope of the federal government's rights to unappropriated water in the western states, it is therefore necessary to look in some detail at the development of western water law and the role played by the federal government in managing and disposing of the western public lands.

333

## A. Development of "Appropriative" Water Rights in the Western States

Because of different climatic, topographic and geographic conditions and the differing demands of agricultural and economic development, the arid and semi-arid western states have developed legal doctrines and administrative machinery governing water rights that bear little resemblance to those developed in the humid eastern states.[5] Most of the eastern states have adopted, with some variations and modifications, the common law riparian theory of water rights. In general, under a riparian theory, the right to use water goes with ownership of land abutting a stream. Each owner of land on a stream has the right to make reasonable use of the water, but cannot interfere unreasonably with the right of a downstream owner to the continued flow of the stream. For example, if the riparian owner diverts the water, he must return it to its natural channel, undiminished except for reasonable consumptive uses. *See* 1 R. Clark, Waters and Water Rights, §§ 4.3, 16.1 (1967) (hereinafter cited as Clark); F. Trelease, Water Law, at 10–11 (3d ed. 1979). Similarly, a landowner in a riparian state generally has the right to make reasonable use of ground water arising on his land, but not to make unreasonable withdrawals of that water if it comes from a pool common to other landowners. *Id.* A landowner's riparian rights exist whether or not he actually takes steps to use the water, and the use may be initiated at any time. *See id.* at 11.

The riparian doctrine has for the most part been adequate to allocate water rights in the eastern states, where water is generally abundant and water problems most often involve flooding, drainage, pollution, or navigation.[6] As the arid and semi-arid western states were settled, however, the riparian system proved to be inadequate to meet the needs of the early settlers, particularly the miners and, later, the farmers.[7] The major problem faced by early settlers in those states was a shortage of water. The two primary occupations, mining and agriculture, required large consumptive uses of water, which could be accomplished only by construction of systems to divert and store available stream and ground waters. Tying water rights to the ownership of adjacent land, and thereby retarding or

---

[5] Land is generally considered arid or semi-arid if it cannot be cultivated without irrigation. *See* Note, *Federal-State Conflicts Over the Control of Western Waters*, 60 Colum. L. Rev. 967 n 2 (1960) (hereinafter cited as Colum Note) Seventeen western states are usually included in this category. Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming. These states, where water is relatively scarce, have developed systems of legal rights to water based on the doctrine of "appropriation" or capture of the water for a productive use *See* discussion at pp 8–11 *infra*. The remaining 31 contiguous states have adopted some form of a riparian system for the allocation of water rights, based on ownership of land *See* discussion at pp 7–8 *infra*. Alaska appears to have largely rejected a riparian doctrine in favor of an appropriative system, while Hawaii has a mixed system based on custom, ancient rights, and legislation *See* 1 Clark, *supra*. § 4 4

[6] Although most of the states outside of the seventeen arid or semi-arid western states still adhere to riparian rights, in many of those states the common law has been codified or preempted by statutes governing specific uses such as construction of dams and use of water by cities, districts and state agencies, or preserving public uses such as minimum flows or, more recently, aesthetic and environmental values *See* F. Trelease, Water Law, *supra*, at 12. Some riparian states now require administrative permits prior to the initiation of new water uses. *Id; see also* F Trelease, "Federal-State Relations in Water Law" (Legal Study No 5, prepared for the National Water Commission) at 15–18 (Sept 7, 1971) (hereinafter cited as "Federal-State Relations").

[7] A riparian system was particularly ill-suited for use by the first wave of miners, who staked their claims at a time when most of the western lands were still owned largely by the federal government and not legally open for settlement Thus, for the most part there was no private ownership of land to which riparian rights could attach. *See* Colum. Note, *supra* n 5, at 969

precluding the diversion of waters from their normal channels, would have entirely frustrated development of the west. *See, e.g., California Oregon Power Co. v. Beaver Portland Cement Co.,* 295 U.S. 142, 157 (1935). Accordingly, based largely on customs of the early miners, the western states developed what has come to be known as the "law of the first taker," or the "appropriative" system. Under an appropriative system, unlike under a riparian system, the right to use water does not depend on ownership of underlying or appurtenant lands. Rather, the right depends on capture or "appropriation" of the water for a particular use. The first person to put water to use is entitled to that water as long as the use continues, to the exclusion of subsequent users. The principle of "first-in-time-first-in-right" embodied in this customary system was quickly confirmed by the state courts,[8] and refined and codified by state statute.[9] Most of the western states have now adopted comprehensive water codes based primarily on appropriation, which provide for recognition, administration, and enforcement of water rights and, in several of those states, for large-scale planning of water resource use.[10]

Although statutory and case law differ in many respects among the western states, there are several common principles that distinguish the appropriative systems from riparian systems. *See generally* Trelease, "Federal-State Relations," *supra* n.6, at 29–33; 1 Clark, *supra,* § 4.

First, the right is based on the beneficial use of water, rather than on ownership of appurtenant land. Unless there has been an actual application of water to a beneficial use, there has been no valid appropriation. The beneficial use is also the measure of the right; an appropriator is entitled to only that quantity of water beneficially used in any given year upon particular land. *See* 5 Clark, *supra,* § 408.1. Uses considered "beneficial" vary from state to state. Recognizing that the term must be applied pragmatically, the states have generally considered beneficial uses to include a variety of productive uses such as mining, irrigation, domestic and municipal uses, industry, power production, stock watering, and, more recently, wildlife preservation and recreation.[11] *See id.* Some states have

[8] *See, e g., Irwin v Phillips,* 5 Cal. P. 140, 63 Am Dec 113 (1855), *Lux v. Haggin,* 69 Cal. 255, 10 P. 674 (1886), *Coffin v Lefthand Ditch Co.,* 6 Colo. 443 (1882).

[9] *See, e.g* , Cal Civ. Code, tit. 8, pt 4, div 2, §§ 1410–22 (1872), Colo Laws 1862, ch. 28, § 13, Colo Laws 1864, § 32, Mont Laws 1865, p 30, §§ 1–2 Bannack Stats 367; §§ 69–70 Mont. Sess Laws 57; Laws of Dec. 9, 1850, Laws of Utah (1866) ch. 110–111, Law of Feb. 18, 1852, Laws of Utah (1866), ch 117; Law of Jan. 17, 1862, Laws of Utah (1866) ch. 119, Hills Laws Ann (Oregon) § 3832 (1864); Howell Code (Arizona) §§ 1, 3 (1864)

[10] For a general description of state water laws, *see* R Dewsnup & D Jensen, A Summary-Digest of State Water Laws (1973) (study prepared for the National Water Commission) and 3 W Hutchins, Water Rights Laws in the Nineteen Western States (U S. Dept. of Agriculture Misc Pub. No. 1206, 1971) Nine of the western states, most notably California, have in the past recognized some limited forms of riparian rights on private lands, in addition to appropriative rights. *See* 1 Clark, *supra,* § 18 2(B). By statute or constitutional amendment those states have largely eliminated or severely circumscribed reliance on riparian ownership, and consequently riparian rights now have, for the most part, only historic significance *See* 5 Clark, *supra,* § 420 The only states in which new uses may be initiated by exercising a riparian right are California and, to a limited extent, Nebraska. *See* F. Trelease, Water Law, *supra,* at 11–12

[11] The Montana and Washington water codes contain examples of broad definitions of beneficial use.

"Beneficial use" . . means a use of water for the benefit of the appropriator, other persons, or the public, including but not limited to, agricultural (including stock water), domestic, fish and wildlife, industrial, irrigation, mining, municipal, power and recreational uses.

Mont Rev Code 1979 § 85–2–102(2)

Uses of water for domestic stock watering, industrial, commercial, agricultural, irrigation, hydro-
Continued

established statutory preferences to be given effect if there are competing applications for new uses that exceed the available unappropriated water supply. These preferences do not generally affect past or existing uses.[12]

Second, the water must be "appropriated," or reduced to possession. As a general rule, appropriation may be accomplished only by a physical diversion of a stream or capture of ground water. Although some states recognize exceptions for uses such as stock watering and irrigation by natural overflow, uses of a whole stream or lake, without diversion, for purposes such as maintenance of minimum instream flows to preserve fish and wildlife or for recreation are often not recognized. *See* 5 Clark, *supra*, § 409.2. A few states allow instream uses on a discretionary basis[13] or provide that state agencies may make appropriations of minimum instream flows for recreational, wildlife, or other purposes.[14]

Third, when there is insufficient water to meet the needs of all appropriators, priority among appropriators is established chronologically, based on the time the various appropriators first put the water to use, rather than based on any proration that takes account of the utility of the competing uses. The priority date gives an appropriative water right its primary value, because it guarantees that a senior (in time) appropriator will receive the entire quantity of water to which he is entitled prior to delivery of any water to a more junior appropriator. Originally, priority dates were established on the basis of when the water was actually put to use. Most western states, however, have enacted statutes requiring noticing or filing of applications for new water uses. In many western states, that statutory procedure is the exclusive means for acquiring water rights. In these so-called "permit states," priority dates are normally fixed by the date of application for the water right rather than the date of actual use. *See* 5 Clark, *supra*, at § 410.1. In permit states, it is possible that an appropriator who fails to make the filings or applications required by state law but actually puts the water to use may find his rights cut off by a more junior appropriator who makes a timely filing.[15]

Fourth, an appropriation of water is a transferable right of permanent, or at least indefinite duration, provided the use is continued. It may be sold or transferred with the land or separately. Changes in the location or nature of the use (but generally not the quantity) may be permitted, provided they do not injure the rights of other appropriators, but in most cases must be approved in advance

---

electric power production, mining, fish and wildlife maintenance and enhancement, recreational, and thermal power production purposes, and preservation of environmental and aesthetic values, and all other uses compatible with the enjoyment of the public waters of the state, are declared to be beneficial

Wash. Rev Code Ann § 90 54.020

[12] *See, e g.,* Ariz. Rev. Stat. Ann § 45–147B (West Supp.) (relative values are (1) domestic and municipal, (2) irrigation and stock watering; (3) power and mining, and (4) recreation and wildlife, including fish); Wyo. Stat. § 41–3–102 (1977); 5 Clark, *supra* , §§ 408.1, 408.4

[13] *See, e.g* , Wyo. Stat. § 41–3–306 (1977) (State Engineer can make allowances for instream stock watering, without recognizing a right to such use).

[14] *See, e.g.,* Colo Rev. Stat § 37–92–102(3), 37–92–103(3) (4) & (10) (1973) (state agency may make appropriations of minimum instream flows).

[15] Particularly where water rights may antedate water codes or adjudication statutes, rights in those states may in some cases be awarded priority by equity decrees or other adjudicative procedures, despite a failure to make the requisite filing *See* 5 Clark, *supra,* § 410.1.

by the state. *See* 5 Clark, *supra*, at § 412; Trelease, "Federal-State Relations," *supra* n.6, at 33.

All the western states have developed administrative or judicial systems to recognize, administer and enforce water rights. In most of these states, new appropriations must be approved by a state administrator (often known as the State Engineer) who has the authority, *inter alia*, to determine if there is sufficient unappropriated water available, if the proposed use is beneficial and, in some states, if the use is in the public interest. *See* Trelease, "Federal-State Relations," *supra* n.6 at 135–36; 1 Clark, *supra*, §§ 20–21. Judicial review of administrative determinations, and adjudication of competing rights are available in each state; often in special courts or under special procedures applicable only to water rights. *Id*. The western states do not generally provide any explicit exemption from their substantive or procedural requirements for the federal government or give any special recognition to uses of water by the federal government that may have no private counterpart, such as minimum instream flows necessary to sustain wildlife and fish or to provide recreational opportunities.[16]

In addition to statutes providing for the appropriation of water and enforcement of water rights, most of the western states have asserted, by statutory or constitutional provision, some form of "title" to or "ownership" of waters by the state or the people of the state.[17] Many of those states also recognize, however, that the federal government may have reserved some "proprietary" interests in unappropriated water appurtenant to federal lands at the time the states were admitted into the Union. In the so-called "California doctrine" and "Oregon doctrine" states,[18] the state courts have held that the federal government had an original property right to all non-navigable waters on the territories that formed those states, a right it did not pass to the states at the time of their admission. Those states, however, by virtue of their sovereignty over lands within their borders, can nonetheless determine rights that appertain to federal as well as private ownership of property, such as the use of water, subject to the ultimate authority of the federal government to determine such rights on federally owned lands.[19] In

---

[16] Some states have, however, recognized that *state* agencies may have particular interests and rights not available to private parties *See* nn 13, 14 *supra*

[17] *See, e g* . Colo Const art. XVI, § 5 ("The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided"), Wyo Const art. VIII, § 1 ("The water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, are hereby declared to be the property of the state"), N.D Const. art XVII, § 210 States such as California, Nevada and Oregon have provided by statute that all water within the state "is the property of" or "belongs to" the public or the people of the state. *See* Cal Water Code § 102, Nev Rev Stat § 533 025 (1979); Ore Rev Stat. § 537 110 (1963). *See generally* E Morreale, *Federal-State Conflicts over Western Waters—A Decade of Attempted "Clarifying Legislation,"* 20 Rutgers L Rev. 423, 446–59 (1966) (hereinafter cited as *Federal-State Conflicts*)

[18] The "California doctrine" states are California, Kansas, Nebraska, North Dakota, Oklahoma, Texas and Washington The "Oregon doctrine" is followed in Oregon and South Dakota *See* Colum. Note, *supra* n.5, at 972–75; Note, *Federal Nonreserved Water Rights,* 48 U Chi L Rev. 758, 766 n.46 (1980); 2 Clark, *supra,* § 102 3.

[19] The "Oregon doctrine" differs from the "California doctrine" in that it construes the Desert Land Act as establishing a uniform rule of appropriation applicable to private and federal rights The "California doctrine" holds that the Desert Land Act, together with the Mining Acts of 1866 and 1870 (discussed at pp 18–24, *infra*) merely recognized and affirmed whatever state system had been developed for allocation of water rights, including systems such as California's that recognized some riparian rights *See* Colum Note, *supra,* n 5, at 972–75; 2 Clark, *supra,* § 102.3.

337

the "Colorado doctrine" states, by contrast, the courts have held that the United States never acquired any proprietary interest in waters in those states, and therefore that the transfer of sovereignty to such states with their admission simultaneously transferred full power to control the disposition and use of those waters.[20]

## B. Role of the Federal Government

The most significant role that the federal government has played in the development of water law in the western states has been that of owner of vast public lands within those states. As we discuss below, the federal government has largely acquiesced in or fostered the development of comprehensive state control over water in the western states, even with respect to water flowing over or arising on federally owned lands. With rare exceptions, Congress has not directly regulated the acquisition or use of water flowing over or arising on federal lands in the western states. The federal laws that have the greatest impact on state interests and state regulation of water rights are directions or authorizations to government agencies to construct projects, administer programs, manage property, and use water on federal lands. To the extent that a "federal" law of water rights exists— *i.e.*, rights that can be asserted under federal statutes without regard to state law—it arises primarily because programs or projects on federal lands operated by federal agencies require the use of water, rather than because federal regulation of the uses of water overlaps with state regulation. As one commentator has noted:

> Most conflicts [between federal and state agencies] have come not from direct clashes between inconsistent laws applicable to the same subject of regulation, but from federal uses or operations which in particular applications do not mesh with state laws or private rights. [For example a] federal project may be illegal, or at least unauthorized, under state water law. A private use under state law may interfere with a federal use of water or of land. A federal use may destroy a state use. A federal program may encourage uses not provided for by state law.

Trelease, "Federal-State Relations," *supra* n.6, at 56–57. Therefore, Congress' policies towards the settlement, disposition, and management of federal lands in the western states provide the context for our consideration of the scope of federal water rights in those states.

### 1. Federal ownership of western lands

The federal government was the original owner of substantially all the land that comprised the western territories.[21] The acts of admission of the western states,

---

[20] The "Colorado doctrine" states are Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming. 2 Clark, *supra*, § 102.3(C) n 21. For a full discussion of the origins and holdings of the California, Oregon, and Colorado doctrines, *see* 5 Clark, *supra*, §§ 401, 405, 420; Colum Note, *supra* n.5, at 972–75

[21] Title to most of the western territories was obtained by the United States from foreign powers through purchase and treaty during the first half of the 19th century. Generally, the terms of acquisition provided for recognition of the few existing private property rights, but granted title over the vast non-private lands to the United States. Texas was an exception, it was admitted by annexation in 1845, and retained title to all its public lands. *See* Morreale, *Federal-State Conflicts, supra* n 17, at 431 & n 41; Colum Note, *supra* n 5, at 968–69 & nn. 8, 9.

which guaranteed each state "equal footing with the original States in all respects whatever" (*see, e.g.,* 9 Stat. 452 (1850)), reserved to the federal government ownership of unappropriated lands within the state, but made no provision with respect to unappropriated waters. *See, e.g., California v. United States, supra,* 438 U.S. at 654. Much of the land originally owned by the federal government has been sold or disposed of under the terms of the federal public land laws,[22] but the federal government still holds title to substantial acreage in the West.[23]

The lands owned by the federal government are generally classified as either "public domain" or "reserved" lands. The public domain includes lands that are open to settlement, public sale, or other disposition under the federal public land laws, and not exclusively dedicated to any specific governmental or public purpose. *See, e.g., Federal Power Commission v. Oregon,* 349 U.S. 435, 443–44 (1955); *United States v. Minnesota,* 270 U.S. 181, 206 (1926). Public domain lands are for the most part managed by the Department of the Interior, through its Bureau of Land Management (BLM).[24] Reserved lands are lands that have been expressly withdrawn from the public domain by statute, executive order, or treaty, and dedicated to a specific federal purpose. Federal statutes authorize reservation of public domain land for a variety of purposes, such as national parks and monuments,[25] national forests, refuges and wilderness areas,[26] reclamation projects,[27] hydroelectric dams,[28] and military facilities.[29] Other withdrawals have been made by executive order, pursuant to the general authority of the Executive Branch to manage and administer federal lands, subject to congressional authorization or assent. *See United States v. Midwest Oil Co.,* 236

---

[22] The term "public land laws" is generally used to refer to statutes providing for the sale or disposition of public lands, such as the Homestead Act, 12 Stat. 392 (1862), 43 U S.C § 161 (1970), and the Desert Land Act of 1877, 19 Stat 377, 43 U.S C § 321 *et seq.,* which provided for land grants to settlers of western lands, and various statutes providing for the sale or grant of public lands to private individuals or the states under conditions set by Congress *See. e.g.,* Act of Aug 18, 1894, 28 Stat. 422, 43 U.S.C § 641 (1976), Public Lands Act of 1964, Pub. L No 88–606, 78 Stat 982, 43 U.S.C § 1391 *et seq* (1970) The sale and disposition of public lands are now governed primarily by the Federal Land Policy and Management Act of 1976, Pub L No. 94–579, 90 Stat 2743, 43 U S C § 1701 *et seq.* Public land laws are usually distinguished from mining laws, which govern the mining of hard minerals on public lands, and mineral leasing laws, which provide for leasing of public lands for gas and oil. *See generally* 63 Am Jur. 2d "Public Lands," § 2

[23] In 1978 the Supreme Court recited that the percentage of federally owned land in the western states, excluding Indian reservations and trust properties, ranged from 29.5 percent of the land in the State of Washington to 86 5 percent of the land in the State of Nevada, with an average of approximately 46 percent *See United States v New Mexico, supra.* 438 U.S at 699 n 3 (1978)

[24] The two major statutes authorizing management of the public domain by the BLM are the Taylor Grazing Act, 48 Stat 1269 (1934), *as amended,* 43 U.S C. § 315 *et seq.,* which authorizes the Secretary of the Interior to manage the public domain for grazing purposes, and the Federal Land Policy and Management Act, *supra* n 22, which directs the Secretary of the Interior to manage the public domain on the basis of "multiple uses" and for "sustained yield " *See* 43 U S C § 1702(c), (h)

[25] *See, e g.,* National Park Service Act of 1916, 39 Stat 535, *as amended,* 16 U.S C § 1 *et seq.,* American Antiquities Preservation Act of 1906, 34 Stat 225, 16 U S C § 431 (1976)

[26] *See, e g ,* Forest Service Creative Act of 1891, 26 Stat. 1103, 16 U S.C. § 471 (1976), Forest Service Organic Administration Act of 1897, 30 Stat 34, 36, *as amended,* 16 U.S.C. § 473 (1976), National Wildlife Refuge Administration Act of 1966, Pub. L No 89–669, 80 Stat 927, 16 U S C § 668dd (1976), Wild and Scenic Rivers Act, Pub. L No 90–542, 82 Stat. 906 (1968), 16 U.S C. § 1271 *et seq.,* Wilderness Act of 1964, Pub. L No. 88–577, 78 Stat 890, 16 U S C. § 1131 *et seq.* (1976).

[27] *See* Reclamation Act of 1902, 32 Stat 390, *as amended,* 43 U.S.C. § 371 *et seq.* (1976).

[28] *See* Federal Power Act, 41 Stat 1075 (1920), *as amended,* 16 U.S.C. § 818 (1976).

[29] *See State of Nevada ex rel. Shamberger v. United States,* 165 F. Supp. 600 (D Nev 1958), *rev'd on sovereign immunity grounds.* 279 F.2d 699 (9th Cir 1960), Act of Feb. 28, 1958, Pub L No 85–337, 72 Stat 27, 43 U.S.C § 155 (withdrawal, reservation or restriction of public lands for defense purposes)

339

U.S. 459, 474 (1915). As a general rule, land that has been withdrawn from the public domain is no longer subject to laws governing the disposition or sale of public lands. *See, e.g., United States* v. *Minnesota, supra,* 270 U.S. at 206.

The terms "public domain" and "reserved lands" are most often used to refer to land that has been owned continuously by the federal government. There is a third category of federally owned land that includes lands acquired by the federal government from private ownership by purchase, exchange, gift, or condemnation pursuant to statutory authorization. *See, e.g.,* 43 U.S.C. § 315g(c) & (d) (grazing lands); 16 U.S.C. § 515 *et seq.* (1976) (national forest lands). These "acquired" lands may become part of the public domain, or may be set aside for specific federal purposes in the same manner as reserved lands. When acquired lands are set aside, they are not characterized as reserved lands, because they were not, strictly speaking, reserved from existing public domain lands. They are nonetheless usually managed under the same statutory authority and for the same purposes as reserved lands,[30] and therefore for most purposes can be considered as part of a federal reservation. *See Rawson* v. *United States,* 225 F.2d 855, 856 (9th Cir. 1955), *cert. denied,* 350 U.S. 934 (1956) ("It may be stated as a universal proposition that patented lands reacquired by the United States are not by mere force of the reacquisition restored to the public domain. Absent legislative or authoritative directions to the contrary, they remain in the class of lands acquired for special uses, such as parks, national monuments, and the like . . . ."); *Thompson* v. *United States,* 308 F.2d 628, 632 (9th Cir. 1962).

Until the end of the 19th century, federal policy emphasized and encouraged settlement and transfer of the public lands to private ownership. *See* Comment, *Federal Non-Reserved Water Rights,* 15 Land and Water L. Rev. 67, 69 (1980); 1 Clark, *supra,* § 20.2. Since that time, however, federal policy has shifted increasingly towards conservation and retention of land in federal ownership and management. The emphasis on retention of lands in federal ownership began around the turn of the century, with establishment by Congress of several national parks and forests, and passage of statutes of general applicability authorizing the reservation of federally owned land for national forests, parks, and historic monuments,[31] and authorizing management of public domain land to promote purposes such as grazing or wide use of the resources on such lands.[32] In addition, the federal government began to take an active role in the promotion, financing, and use of water resources. In the Reclamation Act of 1902, *supra* n.27, for example, Congress established broad authorization for federal development of facilities to reclaim arid lands. The Federal Power Act, *supra* n.28, passed in 1920, authorized the Federal Power Commission to license private power projects, and other acts provided for federal development or construction

---

[30] For example, § 521 of the Forest Service statute provides that acquired forest service lands "shall be permanently reserved, held and administered as national forest lands under the provisions of section 471 of this title and Acts supplemental to and amendatory thereof." 16 U.S.C. § 521.

[31] *See* nn 25, 26 *supra*

[32] *See* n.24 *supra*.

of large-scale multipurpose flood control, navigation, or power projects.[33] Most recently, in 1976 Congress declared in the Federal Land Policy and Management Act, *supra* n.22, that federal policy is to retain public lands in federal ownership unless it is determined, following procedures mandated by the Act, that disposal of a particular parcel will serve the national interest.

## 2. Congressional recognition of state water law

As we described above, even before their admission into the Union, the western states developed customary and statutory laws governing the acquisition and use of water within their borders based primarily on appropriative rights. *See* Part IIA *supra*. Federal ownership of much of the underlying land raised the threat of a general federal law applicable to the acquisition of rights to unappropriated water on federal lands. However, in a series of statutes passed in the last half of the 19th century, Congress rejected the alternative of a general federal water law, and instead largely acquiesced in comprehensive state control over the appropriation of water, including water on federal lands, at least with respect to rights that could be asserted by private appropriators.[34]

The first of these acts, the Mining Act of 1866,[35] officially opened federally owned lands to exploration and development by miners. Act of July 26, 1866, 14 Stat. 253, *codified at* 50 U.S.C. §§ 51, 52 *and* 43 U.S.C. § 661 (1976). Although the primary purpose of the Act was to allow open mining on federal lands,[36] Congress included a provision that specifically disclaimed any intent to interfere with water rights and systems that had developed under state and local law:

> Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the con-

---

[33] *See, e g.*, Boulder Canyon Project Act, 45 Stat. 1057 (1928), 43 U.S C. § 617 (1976), Colorado River Storage Project, 70 Stat 105 (1956), *as amended*, 43 U S C § 620 (1976).

[34] This deference to state control can be contrasted with Congress' approach to control over mining on federal lands, as to which Congress authorized comprehensive procedures and standards for assertion and protection of mineral claims. *See* 30 U S C § 22 *et seq* (1976) The Supreme Court has recently noted that "although mining law and water law developed together in the West prior to 1866, with respect to federal lands Congress chose to subject only mining to comprehensive federal regulation." *Andrus* v. *Charlestone Stone Products Co* , 436 U S. 604, 613 (1978).

[35] The Homestead Act, passed in 1862 (*see* n.22 *supra*), did not contain any reference to water rights or to the appropriation of water by homesteaders

[36] The 1866 Mining Act was passed to thwart legislative initiatives calling for the sale of mining interests on federal lands Its effect was to legalize the system of "free mining" that had been established by custom and local rules of the western mining communities The legislative history of the provision indicates that proponents of the legislation believed it would merely confirm the existing rules and customs. *See* R. Grow & M Stewart, "The *Winters* Doctrine as Federal Common Law," 10 Natural Res Law 457, App at 486 n.16 (1980) (hereinafter cited as "Grow & Stewart")

struction of ditches and canals for the purposes herein specified is
acknowledged and confirmed; . . .

43 U.S.C. § 661 (1976).

Four years later Congress amended the Mining Act of 1866 to extend its
applicability to "placer" mines. Act of July 9, 1870, 16 Stat. 218, *codified at* 30
U.S.C. §§ 51, 52, *and* 43 U.S.C. § 661 (1976). In perhaps an overabundance of
caution, Congress reaffirmed in the 1870 Act that water rights obtained under
applicable state or local law were not to be affected by grants made under the Act:

> [A]ll patents granted, or preemption of homesteads allowed, shall
> be subject to any vested and accrued water rights, or rights to
> ditches and reservoirs used in connection with such water rights,
> as may have been acquired under or recognized by the [Mining
> Act of 1866].

43 U.S.C. § 661 (1976).[37]

The Supreme Court has interpreted these acts as expressing congressional
recognition of and acquiescence in the water rights law developed by the western
states:

> Congress intended [by these acts] "to recognize as valid the
> customary law with respect to the use of water which had grown
> up among the occupants of the public land under the peculiar
> necessities of their condition."

*California* v. *United States, supra,* 438 U.S. at 656, *quoting Basey* v. *Gallagher,*
87 U.S. (20 Wall.) 670, 684 (1875). *See also United States* v. *Rio Grande & Dam
Irrigation Co.,* 174 U.S. 690, 704 (1899) ("The effect of this statute was to
recognize, so far as the United States are concerned, the validity of the local
customs, laws and decisions of courts in respect to the appropriation of water").
The effect of the acts was not limited to recognition of rights that had previously
vested under applicable state law or custom:

> They reach[ed] into the future as well, and approve[d] and con-
> firm[ed] the policy of appropriation for a beneficial use, as recog-
> nized by local rules and customs, and the legislation and judicial
> decisions of the arid-land states, as the test and measure of private
> rights in and to the non-navigable waters on the public domain.

*California Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U.S. 142,
155 (1935).

In 1877, Congress passed yet a third statute, the Desert Land Act, *supra* n.22,
which permitted persons in most of the western states to enter and claim irrigable
lands "by conducting water upon the same . . . [by] bona fide prior appropria-

---

[37] The legislative history of this provision of the 1870 Act is sparse, and indicates only that Congress wanted to
assure that water rights vesting under the 1866 Act would not be adversely affected by the new act. *See* Grow &
Stewart, *supra* n.36, App. at 493–94

tion."[38] In what has become an important proviso, Congress limited the amount of water that could be appropriated by such entrymen under the statute to that amount "actually appropriated" and "necessarily used" for irrigation and reclamation. Any excess non-navigable water was specifically saved for the public:

> [A]ll surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.

43 U.S.C. § 321.

This proviso of the Desert Land Act has been given a somewhat broader reading by the Supreme Court than might be warranted by its legislative history, which suggests only that it was included to prevent any individual from monopolizing a source of water on desert lands.[39] In *California Oregon Power Co.* v. *Beaver Portland Cement Co., supra,* the Supreme Court construed the Act as effecting "a severance of all waters upon the public domain, not theretofore appropriated, from the land itself," and reserving those severed waters "for the use of the public under the laws of the states and territories named." 295 U.S. at 158, 162. The Court held that a land patent granted by the federal government to a settler under the Homestead Act did not carry with it any common law riparian rights not recognized by the state, because in the Desert Land Act (if not before) Congress had acquiesced in the authority of the western states to change the common law riparian system to an appropriative system. *Id.* at 158. Although the question before the Court in that case involved competing *private* rights to water arising on federal lands, the language used by the Court to describe the effect of the Desert Land Act is quite broad, and could be interpreted to apply to rights that may be asserted by the federal government:

> What we hold is that following the Act of 1877, *if not before,* all non-navigable waters then a part of the public domain became *publici juris, subject to the plenary control of the designated states,* including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain . . . [t]he Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and

---

[38] The Desert Land Act applies only to California, Colorado, Oregon, Nevada, Washington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, and North and South Dakota. 43 U.S.C. § 323 (1976). It does not apply to Kansas, Nebraska, Oklahoma, or Texas.

[39] *See* F Trelease, *Federal Reserved Water Rights Since PLLRC,* 54 Denver L J 473, 476 (1977). At the time the Act was proposed, concern was voiced that the language "conducting water" upon the desert lands might work a partial repeal of the 1866 and 1870 Acts, and would permit a settler to monopolize available water by conducting it across his land and selling it to contiguous owners *See* Grow & Stewart, *supra* n 36, App. at 495 & n 48. The language quoted above was included to make it clear that an entryman could acquire only such rights as are available by appropriation under state law (*i e ,* limited to the quantity necessary for actual beneficial use). *Id.*

gives sanction, *in so far as the United States and its future grantees are concerned,* to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impediment to its full and successful operation.

295 U.S. at 163–64 (emphasis added). The Desert Land Act has been held inapplicable to federal reserved lands. *See Federal Power Commission* v. *Oregon,* 349 U.S. 435, 448 (1955), discussed at pp. 26–27, 32–33, & n.52.

Thus, in the Mining Acts of 1866 and 1870 and the Desert Land Act, Congress deferred to development by the states of comprehensive water codes and administrative systems, at least with respect to rights of private appropriators. Notwithstanding the broad language in the statutes and in *California Oregon Power Co.* v. *Beaver Portland Cement Co., supra,* it is not so clear, as we discuss *infra,* that Congress also intended to subject *federal* uses of that water to state water law. In that regard, we must consider statutes that touch on the federal government's use of water, including, most importantly, the Reclamation Act of 1902, *supra* n.27, the Federal Power Act, *supra* n.28, passed in 1920, and the McCarran Amendment, July 10, 1952, 66 Stat. 560, 43 U.S.C. § 666.

The 1902 Reclamation Act authorized joint federal-state efforts to construct large-scale reclamation projects on federal lands, subject to the jurisdiction and oversight of the Secretary of the Interior through the Bureau of Reclamation. Several provisions of the Act and subsequent amendments deal explicitly with the acquisition, use, and distribution of water. Section 8 provides expressly for the application of state law:

> Nothing in [this title] shall be construed as affecting or intending to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of [the Act], shall proceed in conformity with such laws, and nothing herein shall in any way affect any rights of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383. Other specific restrictions on the use or distribution of water reclaimed in a federal project appear in § 5, 43 U.S.C. § 431, which prohibits the sale of reclamation water to tracts of land in excess of 160 acres, and § 9 of the Reclamation Project Act of 1939, 43 U.S.C. § 485h, which provides for repayment to the United States of funds expended in the construction of reclamation works and authorizes the Secretary of the Interior to make contracts to furnish reclamation water at appropriate rates for irrigation.

The Federal Power Act established a comprehensive licensing scheme for water power projects constructed by private or public entities on navigable streams or federally owned land. The Act contains two provisions referring to the

applicability of state laws: § 9b, which requires an applicant to present evidence of "satisfactory compliance" with certain state laws;[40] and § 27, which expressly saves certain state laws relating to property rights in the use of water from supersedure by the Act.[41]

The McCarran Amendment is not a substantive statute, but rather a limited waiver of sovereign immunity permitting the United States to be joined as a party in state general stream adjudications. It does not affect the federal government's substantive rights with respect to water on federal lands. However, the Act has often been relied upon as evidence of congressional recognition of the primacy of the western states' interests in regulating and administering water rights. *See, e.g., California v. United States, supra,* 438 U.S. at 678–79. This position is supported by the Senate Report on the Amendment, which states that:

> In the arid Western States, for more than 80 years, the law has been the water above and beneath the surface of the ground belongs to the public, and the right to the use thereof is to be acquired from the State in which it is found, which State is vested with the primary control thereof . . . . Since it is clear that the States have the control of water within their boundaries, *it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the State,* if there is to be a proper administration of the water law as it has developed over the years.

S. Rep. No. 755, 82d Cong., 1st Sess. 3, 6 (1951) (emphasis added).

In each of these statutes, Congress recognized that the western states have a legitimate interest in and responsibility for the allocation of water resources within their borders. Specific provisions of federal statutes such as the Reclamation Act and Federal Power Act, however, have led to conflicts between federally mandated uses of water and state regulation of those uses. Those conflicts were left to the courts to resolve.

### 3. Judicial recognition of federal water rights

The Supreme Court has grappled on several occasions with the federal government's rights to use or dispose of water in the western states in the context of particular federal statutes, including the Reclamation Act and the Federal Power Act and statutes authorizing the reservation of land for particular federal purposes. Because Congress has not legislated definitively on the scope of the

---

[40] Section 9(b) requires an applicant to provide the Federal Power Commission with "satisfactory evidence that [he] has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purpose of a license under this chapter" 16 U.S C § 802(b).

[41] Section 27 provides that "[n]othing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein " 16 U.S C. § 821.

federal government's rights to use water on federal lands in the western states,[42] we must look at the Court's construction of those specific statutes to determine the principles and analysis the Court would apply to questions of federal rights that have not yet been litigated.

The Supreme Court has recognized that even if a particular federal statute does not expressly authorize a federal agency to acquire water rights without regard to applicable state law, the federal government may nonetheless in some circumstances assert an *implied* right to use or divert unappropriated water in derogation of state law. The Supreme Court's recognition of such implied rights has rested in each case on a finding of implied congressional intent to preempt application of state law. The Court has found such intent in at least two circumstances: (1) when land is reserved from the public domain for a specific federal purpose *(see United States* v. *New Mexico, supra);* or (2) when state regulation of the use of water by a federal agency or licensee is inconsistent with specific congressional directives governing the construction or operation of a federal project requiring the use of water *(see California* v. *United States, supra).*[43]

a. *Federal reserved rights.*

It is now settled that when the federal government reserves land for a particular federal purpose, it also reserves, by implication, enough unappropriated water as is reasonably necessary to accomplish the purposes for which Congress authorized the land to be reserved, without regard to the limitations of state law. The right to that water vests as of the date of the reservation, whether or not the water is actually put to use, and is superior to the rights of those who commence the use of water after the reservation date. *See Cappaert* v. *United States,* 426 U.S. 128, 138 (1976); *United States* v. *New Mexico, supra,* 438 U.S. at 698.

Although the reserved rights doctrine is now well-recognized, its contours and scope have been defined only recently. The doctrine had its origins in *United States* v. *Rio Grande Dam & Irrigation Co.,* 174 U.S. 690 (1899). In that case, the Court upheld an injunction restraining the petitioner from constructing an irrigation dam that would have destroyed the navigability of the Rio Grande River. While the Court recognized that Congress had by statute acquiesced in the substitution of appropriative water rights for common law riparian rights in the western states *(see* p. 20 *supra),* it found that Congress had not waived its superior authority under the Commerce Clause to preserve the navigability of navigable waters. The Court listed two "limitations" inherent in the Supremacy Clause on the authority of the states to change the common-law rules:

> First, that, in the absence of specific authority from Congress, a state cannot, by its legislation, destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters, so far, at least, as may be necessary

---

[42] *See* n 91 *infra.*

[43] As we discuss *infra,* the constitutional basis for federal water rights is the same in both circumstances enumerated above, whether the rights fall within the "reserved" rights category or within the category of "specific congressional directives." Because the Supreme Court has developed the reserved right doctrine in a few, well-defined cases, for clarity we will set out the decisions in these two categories separately.

346

> for the beneficial uses of the government property; second, that it
> is limited by the superior power of the general government to
> secure the uninterrupted navigability of all navigable streams
> within the limits of the United States.

174 U.S. at 703. The Court's holding rested only on the second limitation—*i.e.*, the federal goverment's superior authority under the Commerce Clause to preserve the navigability of the stream.[44]

Nine years later in *Winters* v. *United States*, 207 U.S. 565 (1908), the Court relied, *inter alia*, on the first limitation described in *Rio Grande*—the inability of the state to destroy the federal government's rights to the continued flow of a stream "at least, as may be necessary for beneficial uses of government property"—to support implication of a so-called "reserved" right to water under a treaty between the federal government and the Indians of the Fort Berthold Reservation. The treaty set aside particular tracts of the public domain as a homeland for the Indians, but did not expressly provide for the water necessary to irrigate that land. The Court found nonetheless that the treaty and reservation of land impliedly set aside sufficient water for the present and future needs of the Indians, reasoning that Congress' intent that the Indians become a pastoral and civilized people could not be accomplished without sufficient water to irrigate the reservation land. 207 U.S. at 576. Citing *Rio Grande*, the Court opined that, "[t]he power of the Government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be." *Id.* at 577.

Until 1955, the *Winters*, or reserved right doctrine, was generally thought to be a special rule of Indian law, rather than a general rule applicable to all federal reservations. *See* F. Trelease, "Federal Reserved Water Rights Since PLLRC," 54 Denver L. J. 475 (1977). In 1955, the Supreme Court suggested for the first time that other types of federal reservations might also provide a basis for federal reserved rights. In *Federal Power Commission* v. *Oregon*, 349 U.S. 435 (1955), often referred to as the *Pelton Dam* decision, the Court considered whether a state agency could deny permission to a federal licensee under the Federal Power Act to construct a hydroelectric dam on lands of the United States that had been reserved for that purpose. The state argued, relying on the Court's broad language in *California Oregon Power Co.* v. *Beaver Portland Cement Co.* (*see* pp. 21–22 *supra*), that by the Desert Land Act of 1877 Congress had expressly conveyed to the states the power to regulate all unappropriated water within their borders, and that therefore, in the exercise of its police powers, Oregon could deny use of those waters to an individual, even if the federal government had otherwise licensed the use. The Court rejected the state's arguments on the ground that the Desert Land Act applies only to public domain lands and does not apply to lands that have been reserved by the federal government, even if the land

---

[44] Nearly seventy years later, the Supreme Court stated that the holding in *Rio Grande* was limited, and to be construed as reaffirming the rights of the states over disposition and use of water except in narrow and specific circumstances "[E]xcept where the reserved rights or navigation servitude of the United States are invoked, *the State has total authority over its internal waters.*" *California* v. *United States, supra,* 438 U.S. at 662 (emphasis added).

347

was reserved after passage of the Desert Land Act. *See* 349 U.S. at 448. Although the *Pelton Dam* decision did not involve directly the federal government's right to use water because the licensee was a private party, the Court's holding implies that the licensee was exercising some right of the United States to use water that had been reserved from state control at the time the United States reserved the dam site. *See, e.g., Cappaert* v. *United States, supra,* 426 U.S. at 144 n.10; *Federal Power Commission* v. *Oregon, supra,* 349 U.S. at 453 (Douglas, J., dissenting).

The applicability of the reserved right doctrine to all federal reservations was confirmed in *Arizona* v. *California,* 373 U.S. 546 (1963). There, the Court upheld, with little discussion, a Master's award of reserved rights to the United States in several national wildlife refuges and the Gila National Forest:

> The Master ruled that the principle underlying the reservation of water rights for Indian Reservations was equally applicable to other federal establishments such as National Recreation Areas and National Forests. We agree with the conclusions of the Master that the United States intended to reserve water sufficient for the future requirements of the Lake Mead National Recreation Area, the Havasu Lake National Wildlife Refuge, the Imperial National Wildlife Refuge and the Gila National Forest.

373 U.S. at 601.

The scope of the reserved rights doctrine on non-Indian land remained somewhat uncertain until the Supreme Court's decisions in *Cappaert* v. *United States, supra,* and *United States* v. *New Mexico, supra.* In *Cappaert,* the Court unanimously held that the reservation of Devil's Hole as a national monument under the American Antiquities Preservation Act, *supra* n.25, also reserved sufficient unappropriated water to maintain the scientific value of the reservation—in that case, to maintain the water level in Devil's Hole at the minimal level necessary to preserve the Devil's Hole pupfish, a unique species that had been endangered by a drop in the water level.[45] The Court stated that:

> [t]his Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Reservation of water rights is empowered by the Commerce Clause, Art. I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art. IV, § 3,

---

[45] The case arose as an action by the United States to enjoin pumping of wells by owners of a ranch near the Devil's Hole Monument The pumping had been authorized by a state permit after the date of reservation of the monument *See* 426 U.S. at 134–35.

which permits federal regulation of federal lands. The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams.

426 U.S. at 138 (citations omitted).

The Court made it clear that the determinative issue was whether the federal government intended to reserve unappropriated water, and that such intent would be inferred if "previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created."[46] 426 U.S. at 139. The *amount* of water reserved, however, was "only that amount of water necessary to fulfill the purpose of the reservation, no more." *Id.* at 141 (citations omitted).

In *United States* v. *New Mexico,* the Court upheld, for the first time, a denial of reserved rights to the federal government. In *New Mexico,* the Forest Service asserted reserved rights to waters within the Gila National Forest, including minimum instream flows, "for the requirements and purposes of the forests" as of the date that various tracts of public lands were withdrawn from the public domain for inclusion in the Forest. The Forest Service's claims to reserved rights for, *inter alia,* maintenance of instream flows, recreation, and stock watering were initially granted by the special master appointed to consider all the claims, but were denied by the New Mexico District and Supreme Courts on appeal, on the basis that those uses were not among the purposes included in the Forest Service's Organic Administration Act, pursuant to which the Gila National Forest was created. The New Mexico Supreme Court drew a distinction between the "primary purposes" for which a federal reservation is created, and "secondary uses" of federal lands that may be permitted or authorized by statute or administrative practice, finding that only the former provides a basis for reserved rights. The New Mexico Supreme Court found the primary purposes of national forest reservations to be limited to the preservation of timber and securing of water flows for public and private uses. *Mimbres Valley Irrigation Co.* v. *Salopek,* 90 N.M. 410, 564 P.2d 615, 617–18 (1977).

The United States Supreme Court agreed with both the result and analysis of the New Mexico Supreme Court. Justice Rehnquist, writing for the majority, noted that the application of the reserved right doctrine requires a careful examination of "both the asserted water right and the specific purposes for which the land was reserved" and must rest on the conclusion that "without the water the purposes of the reservation would be entirely defeated." 438 U.S. at 700 (footnote omitted). Such an examination and tailoring of the reserved right is necessary "because the reservation is implied, rather than explicit and because of the history of congressional intent in the field of federal-state jurisdiction with respect to allocation of water." *Id.* at 701–02. The Court noted that, "[w]here Congress has expressly addressed the question of whether federal entities must

---

[46] The Court actually found the requisite congressional intent to be explicit, rather than implied, because the 1952 presidential proclamation reserving the land recited that the "pool . . . should be given special protection." 426 U S at 140

abide by state water law, it has almost invariably deferred to the state law."[47] *Id.* at 702 (footnote omitted).

The Court accepted the primary purpose/secondary use distinction drawn by the New Mexico Supreme Court:

> Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, *that the United States would acquire water in the same manner as any other public or private appropriator.*

*Id.* (emphasis added). Based on the legislative history of the Forest Service's Organic Administration Act, the Court concluded that Congress' intent in authorizing reservation of the Gila National Forest was "that water would be reserved only where necessary to preserve the timber or to secure favorable water flows for private and public uses under state law." *Id.* at 718.[48] The Court found recreation, wildlife, and stock watering to be secondary uses rather than primary purposes of the reservation, and therefore upheld the state court's denial of reserved rights for those uses. The Court did not address the further question whether, if the Forest Service applied under state law for appropriative rights not available under the reserved rights doctrine, the state could deny such rights.[49]

After *Cappaert* and *New Mexico*, it is safe to conclude that a federal agency may acquire unappropriated water on federal lands without regard to state substantive or procedural law, when that land has been reserved pursuant to congressional authorization for a specific federal purpose that requires the use of water. The right is based on implied congressional intent, and is limited in two

---

[47] In *California v. United States, supra,* decided the same day as *New Mexico,* Justice Rehnquist, again speaking for the majority, discussed at length the "purposeful and continued deference to state water law by Congress," including principally the Mining Acts of 1866 and 1870, the Desert Land Act and the Reclamation Act of 1902. 438 U.S. at 653–70

[48] The opinion of the Court also concluded that the Multiple-Use Sustained-Yield Act of 1960, 16 U S.C. § 528 (MUSYA), which provides that national forests "shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," does not provide any basis for assertion of reserved rights in forests existing as of the effective date of the MUSYA "for the *secondary* purposes there established " 438 U S at 715. The Court "intimate[d] no view as to whether Congress [in the MUSYA] authorized the subsequent reservation of national forests out of public lands to which a broader doctrine of reserved water rights might apply." *Id.* at n.22 As Justice Powell pointed out in his partial dissent from the Court's opinion, the Court's statements on the effect of the MUSYA are probably *dicta* because the United States did not argue that the MUSYA reserved additional water for use on national forests, but only that the Act confirmed Congress' intent in the Organic Administration Act to establish multiple purposes that include fish, wildlife, and recreation *See id* at 718 n.1.

[49] *New Mexico* was a split decision, with Justices Brennan, White, and Marshall joining in a dissent written by Justice Powell The dissenters, however, did not take issue with the conclusion of the majority that Congress had generally deferred to state water law and therefore "that the implied-reservation doctrine should be applied with sensitivity to its impact upon those who have obtained water rights under state law and to Congress' general policy of deference to state law," and concurred in the majority's conclusion that the Organic Administration Act could not be read "as evidencing an intent to reserve water for recreational or stock watering purposes " 438 U.S at 718 The dissenters disagreed rather with the majority's narrow reading of the legislative history of the Organic Administration Act to exclude preservation of wildlife as a primary purpose of the reservation of national forests *Id.* at 719

crucial respects. First, federal rights will be implied only if necessary to accomplish the specific purposes for which Congress authorized reservation of the land, not for incidental, or "secondary" uses that may be permitted by congressional authorization or acquiescence in agency practice. Drawing the line between the "primary purposes" for which water may be reserved and the "secondary uses" for which water may not be reserved requires a careful examination of congressional intent, as expressed in the particular statute authorizing reservation and management of the land in question and its legislative history. Second, the amount of water reserved is only that minimally necessary to accomplish those primary purposes—i.e., that water "without [which] the purposes of the reservation would be entirely defeated." *United States* v. *New Mexico, supra,* 438 U.S. at 700.

b. *Conflicts with congressional directives.*

In the second relevant line of decisions, the Court has held that a state may not veto a federally authorized water project by requiring the federal government or its licensee to obtain a state permit authorizing use of water necessary for the project, and may not impose conditions on the acquisition, use, or distribution of project water that are inconsistent with specific congressional directives authorizing the project. Although in these cases the Court has not developed a coherent theory of water rights comparable to the reserved right theory, there is a common thread: when the federal government, in the exercise of its constitutional powers, for example under the Commerce or Property Clauses, authorizes a project requiring the diversion or use of water, state laws that would effectively prevent the project from being built or operated under the conditions and terms and for the purposes prescribed by Congress must fall under the Supremacy Clause.

The Court has consistently held that a state cannot block construction or operation by the United States or its licensee of dams and reservoirs for flood control, improvement of navigation, power production, or reclamation.[50] For example, in *Oklahoma* v. *Guy F. Atkinson Co.,* 313 U.S. 508 (1941), the Court held that Oklahoma could not block construction by the United States of a dam and reservoir for purposes of flood control and improvement of navigability on the Red River in Oklahoma and Texas. One of the objections raised by Oklahoma to the federal project was that construction of the dam and impoundment of the waters would be inconsistent with the state's water resources program. The Court rejected that argument, finding that:

> [T]he suggestion that this project interferes with the state's own program for water development and conservation is likewise of no

[50] The Supreme Court has recognized that Congress' constitutional authority to construct or license such projects can stem from any of several constitutional grants of power, such as the Commerce Clause, which provides the basis, *inter alia,* for regulation and promotion of the navigability of streams, the Property Clause, which authorizes Congress to manage federal lands, or the General Welfare Clause. *See, e g , Oklahoma* v. *Guy F. Atkinson Co.,* 313 U.S. 508, 534 (1941) (flood control and navigation project authorized under Commerce Clause); *First Iowa Coop.* v. *Federal Power Comm'n,* 328 U S. 152, 176 (1946) (hydroelectric project on navigable stream authorized under Commerce Clause), *Federal Power Comm'n* v *Oregon,* 349 U S. 435, 445 (1955) (hydroelectric project on non-navigable stream authorized under Property Clause, because project to be constructed on federal lands); *United States* v. *Gerlach Live Stock Co ,* 339 U.S 725, 737–38 (1950) (reclamation project authorized under General Welfare Clause).

351

> avail. That program must bow before the "superior power" of
> Congress.

313 U.S. at 534–35 (citations omitted).

Similarly, in cases involving federal licenses to construct hydroelectric projects awarded under the Federal Power Act, the Court has consistently rejected state attempts to block authorization of the construction of project facilities and reservoirs. *See, e.g., First Iowa Cooperative* v. *Federal Power Commission*, 328 U.S. 152, 176 (1946); *Federal Power Commission* v. *Oregon*, 349 U.S. 435, 445 (1955); *City of Tacoma* v. *Taxpayers of Tacoma*, 357 U.S. 320, 340 (1958). Although some of the language used by the Court in those decisions suggests that state law or permit requirements do not apply to federally licensed projects even if they are consistent with the authorization of the project,[51] in each case application of state law would have prevented construction of the project.[52] Given a direct conflict between federal authorization and state requirements, the Court held that the state law must fall, even though the Federal Power Act contained savings provisions reserving traditional control over water resources to the individual states. *See First Iowa Cooperative* v. *Federal Power Commission*, *supra*, 328 U.S. at 176; *City of Tacoma* v. *Taxpayers of Tacoma*, *supra*, 357 U.S. at 340; *Federal Power Commission* v. *Oregon*, *supra*, 349 U.S. at 445.

The Court has reached similar conclusions in cases involving the reclamation laws.[53] Despite the direction of § 8 of the 1902 Reclamation Act that the Secretary of the Interior "proceed in conformity" with applicable state laws (*see* pp. 22–23 *supra*), the Court has held that state law or permit requirements are preempted if they are inconsistent with other, more specific provisions of the Act or of the legislation authorizing the project. In *Ivanhoe Irrigation District* v. *McCracken*, 357 U.S. 275 (1958), the Court reversed the refusal of the California Supreme Court to confirm certain reclamation contracts that contained clauses implementing § 5 of the Reclamation Act of 1902 and § 9 of the Reclamation Project Act of 1939 (*see* p. 23 *supra*) because limitations imposed by those sections were inconsistent with California law. The California Court had held that

---

[51] For example, in *First Iowa Coop*, the Court, discussing the effect of the savings provisions of the Act, noted broadly that "in those fields where rights are not thus 'saved' to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course " 328 U.S. at 176. *See generally Federal Power Comm'n* v *Oregon, supra,* 349 U.S. at 444–45 ("There thus remains no question as to the constitutional and statutory authority of the Federal Power Commission to grant a valid license for a power project on reserved lands of the United States, provided that, as required by the Act, the use of the water does not conflict with vested rights of others. To allow Oregon to veto such use, by requiring the State's additional permission, would result in the very duplication of regulatory control precluded by the *First Iowa* decision ") (citations omitted).

[52] In *First Iowa Coop*, the power cooperative's development plan required diversion of the Cedar River into another basin in order to get a greater drop and head for water power. That plan would have been barred by an Iowa statute requiring that any water taken from a stream for power purposes be returned to the same stream at the nearest practicable location. *See* 328 U S. at 166 In *Federal Power Comm'n* v. *Oregon*, the State of Oregon sought to prevent construction of the dam because it would cut off anadromous fish from their spawning and breeding grounds 349 U.S. at 449–50. *City of Tacoma* involved a conflict between the terms upon which the FPC issued a license to the City to construct a power dam on the Cowlitz River, and a Washington statute prohibiting the construction of dams over 25 feet in height on the Cowlitz or other state streams tributary to the Columbia, for protection of salmon. *See* 357 U.S. at 328 n.11.

[53] Most large federal reclamation projects are authorized by specific legislation and appropriations, but incorporate by reference the provisions of the federal "reclamation laws," including, most importantly, the 1902 Act. *See, e.g., California* v. *United States, supra,* 438 U.S. at 651 n 6.

352

§ 8 required that "whenever there is a conflict between the Federal Reclamation laws and the laws of the State, the law of California must prevail." 357 U.S. at 287. The United States Supreme Court held that the general savings provision of § 8 could not override the mandatory, specific provisions of § 5 and § 9. *Id.* at 292.[54] The Court reaffirmed this view of § 8 in *City of Fresno* v. *California,* 372 U.S. 627 (1963), in which the Court held that § 8 does not require the Secretary of the Interior to ignore the explicit preference established by § 9(c) of the Reclamation Act of 1939 for irrigation over domestic and municipal uses of reclamation water (*see* p. 23 *supra*); and in *Arizona* v. *California,* 373 U.S. 546 (1963), in which the Court concluded that state law could not interfere with the power of the Secretary of the Interior, under the Boulder Canyon Project Act, *supra* n.33, to determine with whom and on what terms water contracts would be made.

Language used by the Supreme Court in *Ivanhoe, Fresno,* and *Arizona* suggested that the scope of § 8 was extremely narrow. In *Ivanhoe,* for example, the Court stated that § 8 "merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested rights therein." 357 U.S. at 291. The Court suggested in *Fresno* that state law would not control even the acquisition of water rights when the United States exercises its power of eminent domain, but instead would only determine the "definition of the property interests, if any, for which compensation must be paid." 372 U.S. at 630. In *Arizona,* the Court endorsed its broad holdings in *Ivanhoe* and *Fresno,* noting "[t]he argument that § 8 of the Reclamation Act requires the United States in the delivery of water to follow priorities laid down by state law has already been disposed of by this Court . . . ." 373 U.S. at 586.

However, in *California* v. *United States, supra,* decided the same day as *United States* v. *New Mexico,* the Court made clear that its decisions in *Ivanhoe, Fresno,* and *Arizona* could be read only to hold that state laws governing the appropriation, use, control, or distribution of water do not control federal uses if they are inconsistent with specific congressional directives, for example § 5 of the Reclamation Act or § 9 of the Reclamation Project Act of 1939. *California* v. *United States* involved construction of the New Melones Dam in California, part of the mammoth Central Valley Reclamation Project, which has spawned much of the case law under the Reclamation Act.[55] The California State Water Resources Control Board, upon application by the Bureau of Reclamation, authorized the impoundment of water for the project, but imposed several conditions on the use of that water. The Bureau of Reclamation then sought a declaratory

---

[54] The Court also rejected a constitutional challenge to the reclamation projects in question, finding that "[t]here can be no doubt of the Federal Government's general authority to establish and execute" the projects under the General Welfare Clause and Property Clauses of the Constitution. 357 U S at 294–95 Those clauses give the federal government the power "to impose reasonable conditions on the use of federal funds, federal property, and federal privileges," and prohibit the states from "compel[ling] uses of federal property on terms other than those prescribed or authorized by Congress " *Id.* at 295

[55] *See, e g , United States* v. *Gerlach Live Stock Co ,* 339 U.S. 725 (1950); *Ivanhoe Irrigation District* v *McCracken, supra; City of Fresno* v *California, supra; Dugan* v *Rank,* 372 U S 609 (1963).

353

judgment that the United States could impound whatever unappropriated water was necessary for the project without complying with state law.

The District Court held that the United States must apply to the State Board for an appropriation permit as a matter of comity, but that the Board must issue the permit without condition if there is sufficient unappropriated water. *United States v. California,* 403 F. Supp. 847 (E.D. Cal. 1975). The Ninth Circuit affirmed, but held that § 8 of the Reclamation Act of 1902, rather than comity, required the United States to apply for the permit. *United States v. California,* 558 F.2d 1347 (9th Cir. 1977). In the Supreme Court the United States argued for affirmance of the decisions below on the ground that a state may not impose any conditions on a federal reclamation project, whether or not they may be consistent with author-ization for construction and operation of the project. *See* Brief for the United States at 31–55, *California v. United States,* 438 U.S. 645 (1978).[56]

In its decision reversing the Ninth Circuit, the Supreme Court recognized that its prior statements regarding the effect of § 8 of the Reclamation Act of 1902 could be read to support the United States' argument, but the Court characterized those statements as *dicta* "to the extent [they] impl[y] that state law does not control even where not inconsistent with . . . expressions of congressional intent." 438 U.S. at 671 n.24. The Court pointed out that each of its prior decisions involved a direct conflict between state law and a specific provision of the federal reclamation laws, and therefore disavowed that *dicta* insofar as it "would prevent petitioners from imposing conditions on the permit granted to the United States which are not inconsistent with congressional provisions authoriz-ing the project in question." *Id.* at 674. Because the courts below had not reached the question whether the conditions actually imposed were inconsistent with congressional directives authorizing the New Melones project, the Court re-manded the case for further consideration.[57] The Court suggested that on remand the district court would be free to consider arguments that the legislation authorizing the New Melones project had "by its terms signif[ied] congressional intent that the Secretary condemn or be permitted to appropriate the necessary water rights for the project in question." *Id.* at 669 n.21.[58]

---

[56] The United States also argued that the conditions imposed on the permit granted by the California Board were inconsistent with the terms upon which construction and operation of the project had been authorized. *See* U.S. Brief at 57–85 Because the lower courts had both found that California could not impose any substantive conditions on the permit, this argument was not considered below.

[57] Three justices (White, Brennan, and Marshall) dissented from the majority's decision, on the ground that § 8 should be read narrowly, as it was in *Ivanhoe, Fresno,* and *Arizona,* to deal only with the acquisition of water rights and to require only that the United States respect water rights that have been vested under state law *See* 438 U S. at 691. The dissent would have upheld the lower court decisions "that the State was without power under the reclamation laws to impose conditions on the operation of the New Melones Dam and on the distribution of project water developed by that Dam, which would be undertaken with federal funds." *Id.* at 693 Justice Powell, who wrote the dissent in *United States v. New Mexico,* joined in the majority in *California.*

[58] On remand, the district court found that certain conditions imposed by the California Board on the amount and purposes of water to be appropriated, the times of the year in which water could be appropriated, and the distribution of water outside certain counties were not inconsistent with Congress' purpose in authorizing the New Melones project. Other conditions, for example, those imposing limitations on the use of impounded water for the production of power were rejected as inconsistent with the congressional intent. *United States v California,* 509 F. Supp 867 (E.D. Cal 1981). Cross-appeals were filed in the Ninth Circuit Those appeals have been briefed and argued and are pending decision. *United States v State of California,* C A Nos 81–4189 and 81–4309 *(appeals docketed* Apr 10, 1981, and June 5, 1981).

354

c. *Administrative practice and interpretations.*

Because the Supreme Court and Congress have not definitively answered many of the questions in the area of federal-state water rights, administrative practice and interpretation by the federal land management agencies have served to fill some of the interstices. We understand that there has never been a uniform policy among the agencies with primary responsibility over federal lands regarding the extent to which the federal government should or would comply with state laws and procedures in acquiring water rights or give notice to appropriate state agencies or officials of the water needs and uses of the agency.[59] Agencies have participated in general stream adjudications, at least since passage of the McCarran Amendment in 1952,[60] and have litigated water rights in individual cases, but have not developed wholly consistent policies as to whether they should file all water right claims with state agencies. *See Report of the Task Force on Non-Indian Federal Water Rights* at 35 (Government Printing Office 1980) (hereinafter cited as Task Force Report). For example, the Forest Service and Fish and Wildlife Service, at least since the 1930s, have generally attempted to notify the states of water uses and needs and to file for some water rights pursuant to applicable state law. Task Force Report at 36. Since 1946, the Forest Service has generally not filed for water rights on reserved lands, although it has filed for water rights on acquired lands and, since 1966, has informed state officials of the scope of its reserved water rights. The policy of the National Park Service has been to comply with state water laws, particularly with respect to rights not available under the reserved right doctrine. *Id.* Other agencies have often complied with state procedures in acquiring water rights, but have also asserted rights or used water in many instances without compliance with state law or notice to appropriate state authorities.[61]

While the ad hoc approach reflected in the practice of responsible agencies may have accommodated both state and federal concerns when water supplies were relatively ample, over-appropriation of streams in most of the western states and increasing competition for water between and among private and public users has led to efforts at the state and federal levels to achieve certainty in the definition and allocation of water rights. In 1978, President Carter submitted a Federal Water Policy Message to Congress, which recognized the difficulties created for the states by the existence of unquantified, undetermined federal

---

[59] These agencies include, most importantly, the Department of the Interior, which has jurisdiction over all public domain lands and some reserved lands, such as national parks, refuges, and wilderness areas; the Department of Agriculture, which, through its Forest Service, has jurisdiction over the national forests; and the Department of Defense, which has jurisdiction over military bases and reservations and, through the Army Corps of Engineers, over flood control and navigational public works.

[60] *See, e g., United States v. District Court in and for Water Division No. 5,* 401 U.S 527 (1971); *Colorado River Conservation District v United States,* 424 U.S 800 (1976).

[61] For example, following the *Pelton Dam* decision in 1955, the Department of the Navy apparently ceased filing any claims for water with state agencies. *See Nevada ex rel. Shamberger v United States, supra* n 29, 165 F. Supp. at 606. That has not, however, been the consistent position of the Department of Defense since then We understand, for example, that the Air Force has agreed that water necessary for deployment of the MX missile system in Nevada and Utah will be appropriated only under state laws *See* Letter from Grant C Reynolds, Assistant General Counsel, Department of the Air Force, to Myles E. Flint, Chief, General Litigation Section, Land and Natural Resources Division, Dept. of Justice (Nov 19, 1981).

reserved rights to water in the western states, and recommended that priority be given to quantification of federal reserved rights.[62] At the same time, federal agencies were directed to expeditiously establish and quantify federal reserved rights.

In response to this initiative, Solicitor Krulitz of the Department of the Interior issued a formal opinion in June 1979, covering both "reserved" and "non-reserved" water rights under statutes authorizing the Department of the Interior to manage federal lands. As we discuss in the next segment of this opinion, Solicitor Krulitz articulated the non-reserved water rights theory of the Department of the Interior, stating that the federal government had a right to use water for "congressionally authorized uses" irrespective of any reservation of land. Solicitor Krulitz's opinion provoked a maelstrom in the western states and an almost immediate decision by Interior Secretary Andrus not to implement segments of the Krulitz opinion except in very limited circumstances. Secretary Andrus' announcement was followed in January 1981 by an opinion by Solicitor Krulitz's successor, Solicitor Clyde O. Martz, restricting the application of the Krulitz opinion. In September 1981, the current Solicitor, William H. Coldiron, issued an opinion repudiating the legal basis and conclusions of the Krulitz opinion. Since these opinions have shaped much of the recent debate on the scope of federal water rights,[63] we will review them in detail here.

i. Krulitz Opinion

In his opinion, Solicitor Krulitz set out to analyze comprehensively the legal bases for the Department of the Interior to assert rights to water on federal lands. In addition to federal reserved rights, Solicitor Krulitz concluded that the federal government has the right to make use of unappropriated water on federal lands without regard to state substantive or procedural law, so long as the water is necessary to carry out "congressionally authorized purposes" or "uses," unless Congress clearly and expressly directs otherwise—the so-called federal "non-

---

[62] *Pub. Papers of Jimmy Carter,* 1978, pp. 1044–51. Pursuant to this initiative, a Task Force on Non-Indian Reserved Rights was established. The Task Force issued a final report in 1980, in which it recommended, *inter alia,* that federal agencies attempt to quantify all current and future water requirements, that state law be used to the fullest extent possible for water uses not subject to existing reserved rights, and that the Executive Branch attempt, as a matter of policy, to obtain future water rights by purchase, exchange, condemnation, or appropriation under state law. Task Force Report, *supra,* at 3–6 This last recommendation was "grounded on the belief that, to the extent neither existing state law nor existing federal reserved rights provide an adequate base for federal water needs to carry out congressionally established management objectives, in some cases a new reserved right might be created and in other cases a federal non-reserved right might be asserted." The Task Force urged, however, "that neither course be followed except where it is absolutely essential to carry out congressionally mandated management objectives " Task Force Report at 66–67 The Report did not address in any detail the legal basis for assertion of any federal non-reserved water rights.

[63] Solicitor Krulitz's opinion, in particular, has been the subject of considerable comment. *See. e g.,* The Western States Water Council, "Response to the Solicitor's Opinion on Federal Water Rights of June 25, 1979" (Oct 25, 1979); Note, "Federal Nonreserved Water Rights," 48 U Chi. L. Rev. 758 (1981); F Trelease, "Uneasy Federalism—State Water Laws and National Water Uses," 55 Wash. L. Rev 751 (1980); Comment, "Federal Non-Reserved Water Rights," 15 Land and Water L. Rev. 67 (1980), Note, "Federal Acquisition of Non-Reserved Water Rights after *New Mexico,*" 31 Stan. L. Rev 885 (1979). Solicitor Coldiron's opinion has been the subject of at least one recent comment. *See* Gould, "Solicitor Rejects Non-Reserved Rights," 14 Water Law Newsletter No 3 (Rocky Mountain Mineral Law Foundation 1981).

reserved" water rights theory. Dept. of Interior Solicitor's Opinion No. M–36914, "Federal Water Rights of the National Park Service, Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management," 86 I.D. 553 (1979) (Krulitz Op.). Solicitor Krulitz did not elaborate on the scope of "congressionally authorized purposes" or "uses," but his subsequent discussion of the availability of federal non-reserved water rights under statutes applicable to the Department of the Interior indicates that he thought those purposes and uses should be broadly defined.[64] Thus, in Solicitor Krulitz's opinion, there are only two prerequisites to the existence of a federal non-reserved water right: (1) the assignment of a land management function to a federal agency, *e.g.*, by statute, appropriation, legislation, or acquiescence in long-standing administrative interpretation; and (2) the actual application of water to use.

The non-reserved water right asserted by Solicitor Krulitz is both broader and narrower than the reserved right. It is broader in that it does not depend on a formal reservation of land, and therefore may arise on public domain and acquired, as well as reserved, federal lands. In addition, it is not limited to the specific "primary purposes" for which federal land is managed, but also extends to any management use or function that is permitted by Congress for the land, even if such uses are only incidental to the purposes mandated by Congress for the land, or "secondary," in the language of the Court in *New Mexico*. Thus, under Solicitor Krulitz's formulation, a federal agency may assert a non-reserved right for any secondary use of reserved lands (assuming it has reserved rights covering all primary purposes), and for *all* permissible uses on acquired and public domain lands, whether characterized as primary or secondary. In one respect, however, the non-reserved right is narrower than the reserved right, because it is based on the appropriation of water to actual use, rather than on a reservation of land. Thus, the priority date for non-reserved rights is the date the water was first put to use, and its measure is the amount of water reasonably necessary for that use. By contrast, reserved rights have priority as of the date of the reservation, regardless of when or whether the water was put to use, and extend to all water reasonably necessary for current and future uses. *See, e.g., Cappaert* v. *United States, supra,* 426 U.S. at 138.

Solicitor Krulitz rested his opinion on an asserted federal proprietary interest in unappropriated waters in the western states and the federal government's superior right under the Supremacy Clause to make use of water in furtherance of its constitutional powers. *See* Comment, "Federal Non-Reserved Water Rights," 15 Land and Water L. Rev. 67, 74–75 (1980). He started with the premise that, through cession from foreign nations, the United States acquired ownership of the lands that now comprise the western states and ownership of all rights appurtenant to those lands, including "the power to control the disposition and use of water on, under, flowing through or appurtenant to such lands." Krulitz Op. at 563, 575. He asserted that under the Property Clause of the Constitution, the United States has plenary power to control its property; no interest in that

---

[64] *See* discussion *infra*.

property may be acquired, by the states or private parties, "in the absence of an express grant from Congress . . . ." Solicitor Krulitz concluded that "absent that grant or consent, [the property] continues to be held by the United States."[65] *Id.* (citing *United States v. Grand River Dam Authority*, 363 U.S. 229, 235 (1960); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 404–05 (1917)). Solicitor Krulitz buttressed this conclusion with a Supremacy Clause argument:

> Federal control over its needed water rights, unhampered by compliance with procedural and substantive state law, is supported by the Supremacy Clause and the doctrine that federal activities are immune from state regulation unless there is a "clear congressional mandate," or "specific congressional action," providing for state control.

*Id.* at 564 (citing *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 122 (1954)); *Paul v. United States*, 371 U.S. 245, 263 (1963); *Hancock v. Train*, 426 U.S. 167, 178–81 (1976); *EPA v. State Water Resources Control Board*, 426 U.S. 200, 214, 217, 221 (1976).

Under either theory, the conclusion reached by Solicitor Krulitz as to the applicable legal analysis is the same:

> [T]o the extent Congress has not clearly granted authority to the states over waters which are in, on, under or appurtenant to federal lands, the Federal Government maintains its sovereign rights in such waters and may put them to use irrespective of state law.

*Id.* at 563. Krulitz concluded that neither the equal footing doctrine[66] nor the Acts of 1866 and 1870[67] and the Desert Land Act[68] constituted the necessary clear grant of authority over unappropriated waters on federal lands to the states, and therefore that the federal government may use that water without interference

---

[65] However, Solicitor Krulitz disavowed statements made by a prior Interior Department Solicitor that the United States is the "owner of unappropriated non-navigable water on the public domain" as "broad and irrelevant to the right of the United States to make use of such water." He stated that "concepts of 'ownership' of unappropriated waters are not determinative in federal-state relations in non-reserved water rights." Krulitz Op. at 613 Solicitor Krulitz's partial disavowal of the proprietary basis for federal claims is somewhat confusing and seems inconsistent with his statements that the federal government has a retained "proprietary interest" in waters not otherwise appropriated pursuant to state law and "plenary power" over unappropriated waters on federal lands by virtue of the Property Clause *See, e g , id* at 563, 575.

[66] Solicitor Krulitz concluded that the equal footing doctrine (*see* p. 15 *supra*), which is generally relied on to support state claims of ownership of unappropriated waters, did not divest the United States of its ownership interests in unappropriated waters, because (1) the state acts of admission into the Union contained no express grant of ownership, such as is required when the United States divests itself of its property rights, and (2) state ownership of unappropriated water at the time of admission into the Union is "difficult to square with the reserved rights doctrine . . . as appl[ied] to reservations of land in a state after statehood." Krulitz Op. at 564.

[67] Solicitor Krulitz interpreted the 1866 and 1870 Mining Acts to waive the United States' "proprietary and riparian rights to water on the public domain [only] to the extent that water is appropriated by members of the public under state law . . . ." Krulitz Op. at 565 By negative implication, because the acts did not deal with the federal government's rights to use that water, they recognized the United States' "inchoate federal water rights to unappropriated waters that exist at any point in time " *Id* at 565–66

[68] Solicitor Krulitz interpreted the Desert Land Act as a statute of limited applicability that "does not directly address federal rights to use water for congressionally authorized purposes on the federal lands, but instead is aimed at appropriation and use 'by the public'" Krulitz Op at 566

from the states. Thus, he asserted that by these "relatively narrow" acts, the United States did not divest itself of its authority "to use the *unappropriated* waters on public lands for governmental purposes." *Id.* at 569 (emphasis in original).

Solicitor Krulitz acknowledged that the language of the Supreme Court in *United States* v. *New Mexico, supra,* that, in the absence of a reserved right "there arises the contrary inference that Congress intended federal agencies to acquire water in the same manner as any other public or private appropriator" (438 U.S. at 702) makes it unclear whether federal agencies must conform the assertion of non-reserved federal water rights to state law. He concluded, however, that the Court could not have intended to suggest that state procedural or substantive law would control federal non-reserved uses, because requiring federal agencies to assert non-reserved water rights only for purposes recognized as beneficial under state law would lead to the "anomalous result" that federal land managers would have to manage the same kind of federal land differently in different states. Rather, he argued that the Court intended only to suggest that water rights other than those available as reserved rights must be acquired through some form of appropriation and actual use, and not merely through a reservation of land. *Id.* at 576–77.

As a matter of policy, Solicitor Krulitz recommended that federal agencies comply with procedures established by the states "to the greatest practicable extent." He did not conclude, however, that compliance with state procedural requirements is required as a matter of law. *Id.* at 577–78.

In the second portion of his opinion Solicitor Krulitz outlined reserved and non-reserved federal water rights available to the land management divisions of the Department of the Interior. He acknowledged that the Taylor Grazing Act and the Federal Land Policy Management Act (FLPMA) do not create any reserved rights, but concluded that those statutes express a congressional mandate that the public domain be managed for multiple use and sustained yield purposes, including recreational campgrounds, timber production, livestock grazing, and minimum instream flows necessary to protect and enhance fish and wildlife resources and scenic values. Therefore, he concluded that the BLM may appropriate any water on the public domain necessary to fulfill those purposes. *See id.* at 615. With respect to the National Park Service and the Fish and Wildlife Service, Solicitor Krulitz concluded that those agencies may appropriate (in addition to water available as reserved rights) all unappropriated water necessary to fulfill a broad range of consumptive and non-consumptive uses, including, *inter alia,* conservation of scenery, natural and historic objects, fish, and wildlife; provision for public recreation and enjoyment; construction and maintenance of easements, rights-of-way, and trails; operation of concession operations and construction of airports in national parks; and management of timber, range, agricultural crops, and animals in national refuges. *Id.* at 616–17. Only in § 8 of the Reclamation Act of 1902 did Solicitor Krulitz find a sufficiently clear congressional directive to require that water necessary for operation and maintenance of reclamation projects be acquired pursuant to state law. *Id.* at 615–16.

ii. Martz Opinion

In 1980, Solicitor of the Interior Clyde O. Martz issued a supplemental opinion dealing with the federal non-reserved water rights theory. *See* Dept. of the Interior Solicitor's Opinion No. M–36914 (Supp.), "Supplement to Solicitor Opinion No. M–36914, on Federal Water Rights of the National Park Service, Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management," 88 I.D. 253 (1981) (Martz Op.). Solicitor Martz did not disagree with or disavow Solicitor Krulitz's analysis of the existence and nature of the federal non-reserved water rights theory,[69] but concluded that no federal non-reserved water rights could be asserted under FLPMA or the Taylor Grazing Act. Solicitor Martz noted that FLPMA authorizes a wide range of land management activities that require the use of water, but concluded that the savings provision in § 701(g) of the Act[70] indicates that Congress did not intend to provide an independent statutory basis for claims to water that would be inconsistent with the substantive requirements of state law. Martz Op. at 257–58. Without discussion, he concluded that "[t]he same analysis and conclusion is equally applicable to the Taylor Grazing Act." *Id.*[71]

iii. Coldiron Opinion

The current Solicitor of the Interior, William H. Coldiron, issued an opinion on September 11, 1981, concluding that "there is no federal 'non-reserved' water right" and disavowing the Krulitz and Martz opinions to the extent they asserted that such rights exist. *See* Dept. of the Interior Solicitor's Opinion M–36914 (Supp. I), "Non-Reserved Water Rights—United States Compliance with State Law," (Sept. 11, 1981) (Coldiron Op.). Solicitor Coldiron acknowledged that Congress has the power under the Commerce and Property Clauses to control the disposition and use of water appurtenant to lands owned by the federal government, and that, under the Supremacy Clause, it is "unlikely that state law could preclude reasonable water use by a federal agency if Congress specifies a

---

[69] Solicitor Martz reaffirmed Solicitor Krulitz's conclusion that situations exist in which the federal government has a legal basis for asserting a federal right to use water in a manner not conforming to all substantive requirements of state law, and not available as a matter of a reserved right. "Federal claims in such cases may be founded on Federal supremacy if and where clearly mandated by Act of Congress Such claims may also be supported by the dominion the United States has and continues to exercise over unappropriated waters arising on the public lands." Martz Op. at 256.

[70] Section 701(g) provides, in relevant part:

Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or (1) as affecting in any way any law governing appropriation or use of, or Federal right to, water on public lands; (2) as expanding or diminishing Federal or State jurisdiction, responsibility, interests or rights in water resource development or control

Reprinted at 43 U S.C. § 1701.

[71] Solicitor Martz also noted that the Department of the Interior had previously decided, as a matter of policy, to refrain from asserting non-reserved rights, except if specifically approved in individual cases by the Assistant Secretary or Secretary of the Department, or if the Department was required to submit all claims for water rights in litigation. Martz predicted that in the future most federal water rights would be founded on appropriation or purchase. Martz Op. at 255 n.4.

particular federal usage." Coldiron Op. at 5.[72] However, Solicitor Coldiron observed that Congress can also defer to state control over water resources, and that therefore the crucial question is whether Congress intended to delegate that authority to the states.

Solicitor Coldiron analyzed the question of congressional intent in much the same terms as did the Supreme Court in *California* v. *United States* and *United States* v. *New Mexico*—decisions which Solicitor Coldiron concluded "definitively and directly addressed" the issue of federal non-reserved water rights. Coldiron Op. at 9. Thus, Solicitor Coldiron interpreted the land management statutes of the 19th century, the Reclamation Act of 1902, and other public land use statutes to express congressional recognition of the practical importance of local control of water resources and a general policy of deference to state water law. *Id.* at 6–7. Solicitor Coldiron asserted that only two exceptions have been recognized to this general deference to state water law: the federal navigation servitude and the federal reserved right. *Id.* at 10–11. He concluded, drawing on language from *California* and *New Mexico*, that Congress has given the states broad power to provide for the administration of water rights, which can be infringed by the federal government only where necessary to accomplish the original purpose of a congressionally mandated reservation of land, or to protect the navigation servitude. Therefore, in analyzing land management statutes, the presumption should be that "the United States and its agencies must acquire water rights in accordance with state substantive and procedural law unless necessary for the original purpose of a reservation" (or, presumably, unless incident to the federal government's navigation servitude). *Id.* at 12.

Solicitor Coldiron did not address the question of what evidence of congressional intent is necessary to overcome the presumption that state law applies. He concluded, without an analysis of specific statutory schemes such as that undertaken by Solicitor Krulitz and Solicitor Martz, that "there is an insufficient legal basis for the creation of what has been called federal 'non-reserved' water rights . . . . There is no federal 'non-reserved' water right." Coldiron Op. at 12. This conclusion suggests that, in Solicitor Coldiron's opinion, no existing federal land management statute contains a congressional directive of sufficient specificity to overcome the presumption of deference to state law, and that, unless and until Congress enacts statutes specifically authorizing non-reserved rights or repeals the land management statutes that preserve control over water rights in the states, the only water rights available to federal agencies outside of state law are reserved rights or rights necessary to preserve the navigation servitude. *Id.*

---

[72] Although Solicitor Coldiron's analysis is rooted primarily in the Supremacy Clause, he also found a basis for congressional authority in the United States' ownership of unappropriated water on the public domain. He suggested in his opinion that the United States' power over unappropriated non-navigable water located on the public domain "arises from retention of federal property, including the streams and lakes thereon at the time of statehood," and characterized the pattern of ownership of waters with the western states as follows "[w]hen the various western states were admitted to the Union, the title to the beds and waters of the navigable streams and lakes passed to the new states, with the United States retaining title to the non-navigable waters on the public domain." Coldiron Op. at 5

361

## III. Analysis

### A. *Constitutional Basis for Federal Claims*

#### 1. Congressional authority to preempt state water laws

As a matter of constitutional law, Congress clearly has the power to preempt state law governing the use and disposition of unappropriated water by federal agencies on federal lands. That authority arises from the constitutional provisions authorizing the federal government, for example, to regulate interstate commerce (Art. I § 8), to provide for a common defense (Art. I § 8), to enter into treaties (Art. II § 2), to manage federal property (Art. IV § 3), and to provide for the general welfare (Art. I § 8).[73] In the exercise of its constitutional authority under the Commerce, Property, or General Welfare Clauses, or under its treaty and war powers, Congress has the power to authorize the appropriation of unappropriated water by federal land management agencies. If Congress exercises that power, by operation of the Supremacy Clause such an exercise preempts inconsistent state laws. *See United States* v. *Rio Grande Dam & Irrigation Co., supra,* 174 U.S. at 703; *Oklahoma* v. *Guy F. Atkinson Co.,* 313 U.S. 508, 534 (1941).

Congress may, for example, authorize a comprehensive interstate plan for control and disposition of water resources that preempts inconsistent or duplicating state regulation;[74] provide for maintenance of instream flows without regard to whether such flows are recognized under state law;[75] authorize federal agencies or licensees to divert streams for the construction and operation of hydroelectric projects without regard to state restrictions on such diversions;[76] place limitations or conditions on the use or disposition of water from federal projects that are inconsistent with state laws governing the use of such water;[77] or impliedly reserve water necessary to carry out specific federal purposes at the time land is withdrawn from the public domain.[78] The question, therefore, is not generally whether Congress has the *power* to establish federal rights to unappropriated water, but whether it has exercised that power. *See United States* v. *New Mexico, supra,* 438 U.S. at 698.

It is important to understand that any water rights that may be asserted by the federal government outside of state law—whether called reserved, non-reserved,

---

[73] For the most part, the authorizations to federal agencies that are of concern here are based directly on the Property Clause, which grants Congress the power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Art. IV § 3 cl.2 As we discuss at pp. 51–56 *infra,* we believe the proper analytical approach is to consider that the "property" that is subject to federal control in this context is not the unappropriated water arising on federal lands, but the lands themselves. *See generally Kleppe* v. *New Mexico,* 426 U S. 529, 537–39 (1976).

[74] *See, e.g , Arizona* v *California,* 373 U S. 546 (1963) (Boulder Canyon Project); *Oklahoma* v. *Guy F. Atkinson Co ,* 313 U.S. 508, 534 (1941) (navigation and flood control project)

[75] *See, e g ,* 16 U S.C. § 557b (prohibiting any "federal alteration of the natural water level of any lake or stream" in the Lake Superior National Forest)

[76] *See, e g.,* *Ashwander* v. *Tennessee Valley Authority,* 297 U S. 288, 350 (1936), *First Iowa Coop.* v. *Federal Power Comm'n,* 328 U S. 152, 176 (1946); *Federal Power Comm'n* v. *Oregon,* 349 U.S. 435, 445 (1955), *Tacoma* v. *Taxpayers of Tacoma,* 357 U.S. 320, 340 (1958); *United States* v *Grand River Dam Authority,* 363 U.S 229, 232–33 (1960).

[77] *See, e.g , Ivanhoe Irrigation District* v. *McCracken,* 357 U.S. 275 (1958), *City of Fresno* v *California,* 372 U.S 627 (1963); *California* v *United States,* 438 U S 645 (1978)

[78] *See, e.g., Cappaert* v *United States,* 426 U.S. 128 (1976); *United States* v *New Mexico,* 438 U.S. 696 (1978).

or by some other name—rest on this same constitutional basis. Thus, federal reserved rights are not a unique species of federal rights that arise directly out of the reservation of federal lands, so that, absent a reservation of land, no federal water rights can exist. As one commentator has noted, "the reservation doctrine is not a *source* of federal power." Trelease, "Federal-State Relations," *supra* n.6, at 139 (emphasis added). The reserved right doctrine does not rest on any unique constitutional basis. Rather:

> [t]he federal functions exercised in the name of the reservation doctrine rest instead on the supremacy clause, coupled with the power exercised in making the reservation of land, or with some other power incidentally exercised on the reserved land.

*Id.*[79]

Thus the willingness of the Supreme Court to recognize federal reserved rights does not, under an *exclusio unius* principle, necessarily preclude the federal government from asserting in other circumstances water rights not available under state law or under the reserved right doctrine. The fact that the Supreme Court has never explicitly recognized a non-reserved water right in *haec verba* does not mean that the Court would not recognize the federal government's implied rights to unappropriated water, arising from clear congressional intent, in a situation that has not yet been presented to it.[80] As we discuss below, however,

---

[79] Similarly, the navigation servitude, which has been characterized as one of only two "exceptions" to Congress' deference to state law (*see California v. United States, supra,* at 602; Coldiron Op. at 8), is not a unique source of federal constitutional authority or federal rights. The navigation servitude is a doctrine which holds that the federal government is not constitutionally required to pay compensation if, in the exercise of its power over navigable streams, it takes, destroys, or impairs private property rights that depend on the use or presence of the water. *See United States v. Rands,* 389 U.S 121, 122–23 (1967); *see generally* Trelease, "Federal-State Relations," *supra* n 6, at 72, 175; E Morreale, "Federal Power in Western Waters· The Navigation Power and the Rule of No Compensation," 3 Natural Resources J 1, 64–65, 74–75 (1963). The navigation servitude stems from Congress' power to preserve and promote the navigability of waters, which in turn rests on the Commerce Clause. *See, e.g., Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1 (1824); *United States v Rio Grande Dam & Irrigation Co.,* 174 U.S 690, 707 (1899); *United States v. Grand River Dam Authority,* 363 U S. 229, 232–33 (1960) As with other exercises of constitutional authority, inconsistent state laws, programs, or permit requirements must fall by operation of the Supremacy Clause *See Oklahoma v. Guy F. Atkinson Co ,* 313 U S. 508, 534–35 (1941), *First Iowa Coop v Federal Power Comm'n,* 328 U S. 152, 176 (1946) The analysis of federal water rights under Congress' navigation power is the same as the analysis of any federal water rights. Has Congress exercised its power under the Commerce Clause over navigable waters? If so, what is the scope of the congressional mandate? Would state law conflict with or frustrate that mandate?

[80] Although the Court has recognized under specific statutes such as the Reclamation Act and the Federal Power Act that the federal government has certain rights to unappropriated water outside of the reserved right doctrine (*see* pp. 31–37 *supra*), the Court has not addressed directly a broad assertion of federal implied water rights such as that asserted by Solicitor Krulitz—*i e.,* that a federal agency may assert a federal water right based solely on the assignment of land management functions to a federal agency In *Nebraska v. Wyoming,* 325 U S 589 (1945), an action between Nebraska, Wyoming, Colorado, and the United States for allocation of water of the North Platte River, the Court specifically declined to rule on an argument analogous to that made by Solicitor Krulitz. The United States argued that, given the federal ownership of unappropriated water on federal lands, the federal government could acquire all water necessary to carry out two reclamation projects using water from the river regardless of state law, because "if the right of the United States to these water rights is not recognized [by state law], its management of the projects will be jeopardized " 325 U S at 615 The Court declined to rule on that contention, however, as it found that all necessary rights had been acquired by the United States under applicable law. The Court expressly reserved decision on the broader claim.

> We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system We are dealing here only with an allocation, through the States, of water rights among appropriators The rights of the United States in respect to the storage of water are recognized.

*Id* at 615

363

the reasoning used by the Court in shaping the reserved right doctrine is relevant to an analysis of what other rights the federal government may have. *See* pp. 70–72 *infra*.

## 2. "Ownership" of unappropriated water

Much of the confusion about the federal government's rights to unappropriated water in the western states stems from arguments based on "ownership" of the unappropriated waters on federal lands and the effect of the land management statutes of the 19th century. As we outlined *supra*, Solicitor Krulitz's assertion of a broad federal non-reserved water right, while not clearly stated, apparently rested in part on the assumption that the United States acquired proprietary rights to all unappropriated water on public lands at the time it acquired the territories that became the western states, and that it has never subsequently granted away that proprietary interest except to the extent that private individuals may have actually appropriated water on those lands. Some of the western states have argued that the federal government acquired ownership of unappropriated water together with the public lands, but ceded ownership of the water to the states by the acts of admission into the Union or at least by the passage of the Desert Land Act in 1877, or that the federal government never acquired ownership of those waters.[81] The contention is made that the states therefore own those waters and can exercise control over their use, even if the use is by the federal government. *See, e.g.,* Morreale, "Federal-State Conflicts," *supra* n.17, at 446–59; Colum. Note, *supra* n.5 at 972–74. The only exception to that control is if Congress withdraws land (and water) from the applicability of those acts by a formal reservation.

This proprietary view of western water rights has significant ramifications both for the federal government and the states. As Solicitor Krulitz noted, the Supreme Court has characterized the federal government's control over the use and disposition of its property as "complete" and "without limitation," and has stated that an interest in property of the United States may be acquired only by an express grant from Congress. *See* Krulitz Op. at 563; *Kleppe* v. *New Mexico, supra,* 426 U.S. at 539–40; *Caldwell* v. *United States,* 250 U.S. 14, 20–21 (1919). Therefore, if the United States "owns" the water, it may be contended that all that is necessary to perfect its rights is use of that water for an authorized federal purpose; a state cannot impose any restrictions on that use unless Congress has explicitly granted an ownership interest to the states. *See* Comment, "Federal Non-Reserved Water Rights," 15 Land and Water L. Rev. 67, 76 (1980). At the same time, the ownership theory provides a basis for the states' argument that statehood acts and the federal land acts passed in the 1860s and 1870s *(see* Part IIB(2) *supra)* constituted an express grant of ownership to the states of all unappropriated water within their borders, and that therefore they

---

[81] *See* Part IIA *supra.*

364

may now exercise plenary authority over that water.[82] If the states own that unappropriated water, the only way the federal government can acquire an interest in the water is if Congress withdraws certain lands from the scope of the acts, appropriates water under state law, or acquires existing water rights through purchase, exchange, or condemnation.

We believe that state and federal claims of title to or ownership of unappropriated water within the western states do not provide an adequate basis for either denial or assertion of federal water rights. Arguments made on either side of the issue are difficult to reconcile with the reserved rights doctrine, as it has been developed by the Supreme Court. With respect to state claims of ownership, the theory creates substantial questions concerning the constitutionality of the reserved water rights doctrine. That is, if Congress, either by the statehood acts or land management statutes, gave the states ownership of all unappropriated waters on the public domain, on what basis can the federal government reserve some of that water for a federal use, without compensation, by a withdrawal of land made after ownership of the waters passed to the states? On the other hand, with respect to federal claims, the Supreme Court has clearly limited the reserved rights that the United States can assert to those which are minimally necessary to fulfill the explicit or necessarily implied congressional intent, and has recognized that the United States will not, in every instance, have reserved rights to all unappropriated water on federal reserved lands. *See United States v. New Mexico, supra,* 438 U.S. at 702. If the United States owned all the unappropriated water on the public domain at the time a particular parcel was reserved and had plenary control over its disposition, this limitation would appear to be superfluous, and the Court's extended analysis of the scope of the reserved right doctrine unnecessary.

Furthermore, it seems anomalous to suggest that an entity can own water that has not yet been appropriated, if ownership is understood to mean a proprietary

[82] Aside from the effect of the Mining Acts of 1866 and 1870 and the Desert Land Act, the western states have also asserted other theories to support claims of ownership in unappropriated waters within their borders, viz, (1) in the original thirteen (riparian) states, the federal government had no interest in water as a sovereign and, therefore, under the constitutional equal footing doctrine, which guaranteed admission to the western states on an "equal footing" with the original thirteen states, the federal government relinquished all claims to water within the new states, or (2) Congress by the various acts of admission impliedly accepted or ratified state constitutional and statutory provisions asserting the ownership of water Neither theory provides an adequate or consistent basis for state claims of ownership of unappropriated water Although in *California v. United States, supra,* 438 U S at 654, the Court noted, without elaboration, that "[o]ne school of legal commentators held the view that, under the equal-footing doctrine, the Western States, upon their admission to the Union, acquired exclusive sovereignty over the unappropriated waters in their streams," the Court's interpretation of the equal footing doctrine in other cases has been limited In enera, the Court has interpreted the doctrine to apply only to political rights of sovereignty granted the original states, not to property or economic rights. *See, e g., United States v. Texas,* 339 U.S 707, 716 (1950) In *Arizona v California,* 373 U S 546, 597–98 (1963), the Court rejected the contention that the equal footing doctrine could limit "the broad powers of the United States to regulate navigable waters under the Commerce Clause and to regulate government lands under Art IV, § 3 of the Constitution " *See* discussion at 2 Clark, *supra,* § 102 6 The ratification and compact theories also suffer from several deficiencies. Most notably, the language and meaning of the various constitutional and statutory provisions relied upon by the states vary considerably, as do the admission procedures followed by the western states It is impossible to construct a coherent theory that would apply to each state, especially as several of the western states either have no constitutional or statutory provision asserting ownership or passed such a provision only after admission. The ratification or compact theory would make a state's ownership of unappropriated water within its borders turn on the fortuitous language of its constitution and the circumstances of its admission into the Union As several commentators have noted, the theory therefore provides little support for state claims of ownership *See, e g , Morreale,* "Federal-State Conflicts," *supra* n.17, at 446–55; Trelease, "Federal-State Relations," *supra* n 6, at 117 n*; Goldberg, "Interposition—Wild West Water Style," 17 Stan L. Rev 1, 12–16 (1964).

365

interest in the water. Unappropriated water, much as wild animals, has been viewed as *res nullius*—the property of no one—until it has been captured. *See* F. Trelease, "Government Ownership and Trusteeship of Water," 45 Calif. L. Rev. 638, 643 (1957); Trelease, "Federal-State Relations," *supra* n.6, at 147b–i; Note, "Federal Nonreserved Water Rights," 48 U. Chi. L. Rev. 785, 770–71 (1981). In *Hughes* v. *Oklahoma*, 441 U.S. 322 (1979), the Supreme Court noted that concepts of ownership of or title to natural resources such as natural gas, minerals, landfill areas, birds, fish, and other wildlife is a "legal fiction" that merely expresses legitimate state regulatory interests in the conservation and protection of its natural resources:

> The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.

441 U.S. at 334, quoting *Toomer* v. *Witsell*, 334 U.S. 385, 402 (1948). The Court made it clear that a state's power over wild animals, as over other natural resources, is based on the state's police powers and is subject to ordinary constitutional limitations—in that case, the Commerce Clause.[83]

Thus, claims of ownership of natural resources by the states or by the federal government are best understood as claims of regulatory jurisdiction over those resources, either under the states' police powers or under the federal government's constitutional powers. *See Kleppe* v. *New Mexico*, 426 U.S. 529, 537 (1976) (ownership of wild horses and burros on federal lands is irrelevant to the scope of the federal government's authority under the Property and General Welfare Clauses to protect those horses and burros). This interpretation of the nature of the states' and federal government's interests in unappropriated water is consistent with the approach taken by the Supreme Court in cases involving the use or disposition of water in the western states. The Court has consistently analyzed claims by the states and the federal government over navigable and non-navigable waters as a question of competing regulatory authority, rather than as a question of property rights.[84] *See, e.g., United States* v. *Rio Grande Dam & Irrigation Co., supra,* 174 U.S. at 703; *Winters* v. *United States, supra,* 207 U.S. at 577; *Arizona* v. *California, supra,* 373 U.S. at 597–98; *California* v. *United States, supra,* 438 U.S. at 665–79; *United States* v. *New Mexico, supra,* 438

---

[83] In *Hughes* v. *Oklahoma,* the Court overruled *Geer* v. *Connecticut,* 161 U S 519 (1896), which had sustained against a Commerce Clause challenge a Connecticut statute forbidding the transportation beyond the state of game birds that had been lawfully killed within the state The Court's decision in *Geer* rested on its conclusion that no interstate commerce was involved, because the state had the power as representative for its citizens, who owned all wild animals within the state, to control both the taking and ownership of game that had been lawfully reduced to possession in the state. *See* 441 U.S at 322. In *Hughes,* the Court noted that the *Geer* rationale had been considerably eroded and limited in subsequent decisions dealing with state authority over other natural resources *See* 441 U.S at 329–335. Faced with an Oklahoma statute prohibiting the transport or shipping outside the state of minnows procured from waters within the state, the Court explicitly overruled the holding in *Geer,* and concluded that the Oklahoma law unconstitutionally interfered with interstate commerce *Id.*

[84] In several cases in which the Court has been faced with claims of "ownership" of the unappropriated waters by the states or the federal government, it has refused to address the question, and found a narrower ground for its decision. *See, e g , Ickes* v *Fox,* 300 U S. 82, 96 (1937); *Nebraska* v *Wyoming,* 325 U.S 589, 615–16 (1945)

U.S. at 698. While some of these decisions made reference to the Property Clause, in each instance federally owned *land* was at the center of the controversy, and the references made to the Property Clause may be best understood as relating to an exercise of power over that property. The Court made the distinction between ownership and regulatory jurisdiction clear in a slightly different context in *United States* v. *California*, 332 U.S. 19, 36 & n.20 (1947). In that case, the Court found that California does not hold title to submerged lands off its coast by virtue of the equal footing doctrine, but that California could nonetheless exercise police powers over waters flowing over that land, limited by constitutional constraints such as the Commerce Clause or the war power. *See id.*

The question is not one of competing ownership, therefore, but of competing regulatory jurisdiction. As one commentator has noted:

> The state and federal governments share an interest in proper regulation of water. Neither "owns" unappropriated water but each has the power to use it and to regulate its use . . . . The important question is whether state or federal rules of capture apply to the United States. In other words, the issue is whether Congress has established a federal regulatory jurisdiction over federal appropriations, or has recognized the inherent regulatory jurisdiction of the states and adapted federal programs to it.

Note, "Federal Nonreserved Water Rights," 48 U. Chi. L. Rev. 758, 772 (1981) (footnotes omitted).

### 3. Effect of Mining Acts of 1866 and 1870 and the Desert Land Act

The major 19th century land acts—the Mining Acts of 1866 and 1870 and the Desert Land Act of 1877 (*see* pp. 18–21 *supra*)—can thus best be understood as an allocation of jurisdiction to regulate the use of unappropriated water on federal lands between the states and the federal government, rather than a conveyance of property interests in that water. *See* Trelease, "Federal-State Relations," *supra* n.6, at 147; Morreale, "Federal-State Conflicts," *supra* n.17, at 432. Since Congress has the power to cede its constitutional authority over federal uses of such water to the states, the question is whether those acts divested the federal government of that authority.[85]

The Supreme Court's treatment of those acts, particularly the Desert Land Act, has been ambiguous and far from definitive. In *California Oregon Co.* v. *Beaver*

---

[85] At one time the Justice Department took the position that Congress could not provide for state administration of federal property rights because to do so would be in contravention of Article IV, § 3 of the Constitution and the separation of powers principle *See* Letter of Deputy Attorney General William P. Rogers to Sen. James E. Murray, Chairman, Senate Committee on Interior and Insular Affairs, dated March 19, 1956, *reprinted in* S. Rep No. 2587, 84th Cong , 2d Sess. 25 (1956) This Office has since *rejected that position. See* Memorandum for James W Moorman, Assistant Attorney General. Land and Natural Resources Division, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel (Jan 22, 1980), at 13 n 10 As we stated in that memorandum, "[t]he Supremacy Clause charges the States with protecting federal rights and, other than sovereign immunity limitations, we perceive no constitutional or common law limitations on state administration of those rights " *See generally United States* v *New Mexico,* 438 U S. 696 (1978); *California* v *United States,* 438 U.S. 645 (1978)

*Portland Cement Co., supra,* for example, the Court stated that, "[the Desert Land Act] . . . recognizes and gives sanction, *in so far as the United States and its future grantees are concerned,* to the state and local doctrine of appropriation." 295 U.S. at 164 (emphasis added). Even if that language could be interpreted as an unambiguous statement that the Desert Land Act applies to *federal* uses, the case involved only competing claims by private parties, not claims by the federal government, and the Court's statement must be regarded as *dictum. See* pp. 21–22 *supra.* In the *Pelton Dam* decision, which did involve, at least indirectly, claims by the federal government (*i.e.,* through its licensee), the Court characterized the Desert Land Act as severing, *"for purposes of private acquisition,* soil and water rights *on public lands." Federal Power Commission* v. *Oregon, supra,* 349 U.S. at 448 (first emphasis added; second emphasis in original). Again, however, the Court's statement is not definitive, because the Court refused to rule on the general question of the effect of the Desert Land Act or the 1866 and 1870 Acts on a state's exercise of jurisdiction over unappropriated water within its borders, holding only that the acts do not apply to federal reserved lands.[86] *Id.* In *Cappaert* v. *United States, supra,* the court characterized the Desert Land Act as "provid[ing] that patentees of public land [*i.e.,* private purchasers or grantees] acquire only title to land through the patent and must acquire water rights in nonnavigable water in accordance with state law." 426 U.S. at 143. Although that characterization appears to limit the effect of the Act (and, by implication, the preceding Mining Act of 1866 and 1870) to rights that may be acquired by private appropriators,[87] the Court rested its holding, as in the *Pelton Dam* decision, on the inapplicability of the Act to federal reserved lands. *Id.* at 144 & n.9.

Although the issue is not free from doubt, we believe that the sounder view is that the Mining Acts and Desert Land Act authorize state control only over appropriations by private individuals of unappropriated water on federal lands, and do not, by their terms, cede to the states control over the federal government's use of water for federal purposes and programs. That interpretation is suggested by the Supreme Court's language quoted above from the *Pelton Dam* decision and *Cappaert* v. *United States.* Moreover, it is consistent with the legislative background and history of the Acts. At the time the Mining Acts and Desert Land Act were passed, the concern at the state and federal level was not with possible federal-state conflicts over the use of water on the public lands, but rather with settlement of private disputes between private claimants. *See generally* 2 Clark, *supra,* § 102.5. The somewhat sparse legislative history of the acts suggests that the primary—if not the only—contemplated purpose of provisions of the acts dealing with water rights was to clarify that private patentees or users of federal lands would not acquire, by virtue of that ownership or use, any rights to

[86] In *Federal Power Comm'n* v. *Oregon, supra,* the state argued that the 1866, 1870, and 1877 legislation constituted express congressional conveyances to the states of the power to regulate the use of non-navigable waters The Supreme Court found it unnecessary "to pass upon the question whether this legislation constitutes the express delegation or conveyance of power that is claimed by the State, because these Acts are not applicable to the reserved lands and waters here involved." 349 U S. at 448.

[87] *See Cappaert* v *United States, supra,* 426 U S. at 143 n.8.

unappropriated water except as recognized by state law. *See generally* Grow & Stewart, *supra* n.36, at 468–69.[88]

It was not until the end of the 19th century that federal users of water within the western states began to be of major concern. In *United States* v. *Rio Grande Dam & Irrigation Co.*, *supra*, one of the first cases to discuss a federal-state conflict over the use of water resources within those states, the Court noted that the Mining Acts and Desert Land Act must be interpreted "in the light of existing facts," *i.e.*:

> . . . that all through this mining region in the West were streams, not navigable, whose waters could safely be appropriated for mining and agricultural industries, without serious interference with the navigability of the rivers into which those waters flow. And in reference to all these cases of purely local interest the obvious purpose of Congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention to the common-law rule, which permitted the appropriation of those waters for legitimate industries. *To hold that Congress, by these acts, meant to confer upon any state the right to appropriate all the waters of the tributary streams which unite into a navigable water course, and so destroy the navigability of that water course in derogation of the interests of all the people of the United States, is a construction which cannot be tolerated.* It ignores the spirit of the legislation, and carries the statute to the verge of the letter, and far beyond what, under the circumstances of the case, must be held to have been the intent of Congress.

174 U.S. at 706–07 (emphasis added). The Court clearly affirmed that the intent of the Mining Acts and the Desert Land Act was to deal with issues of local concern—*i.e.*, private appropriations—and not to interfere with Congress' superior right, in the exercise of a constitutional power such as that over navigation, to use water within the western states.[89] *See, e.g.*, Colum. Note, *supra* n.5, at 980.

We believe the conclusion that the acts by their terms do not cede regulatory authority over federal uses to the states is consistent with the Supreme Court's holding in the *Pelton Dam* decision that the acts do not apply to federal reserved lands. In the *Pelton Dam* decision, the Court rested its conclusion on its

---

[88] In particular, it is difficult to construe the Desert Land Act as ceding the federal government's control over its use of water on federal lands in the 17 western states, because the Act does not apply to all 17 states or to navigable waters within those states *See* n 38 *supra*

[89] This part of the Court's holding in *Rio Grande* cannot be dismissed as dealing only with the federal government's power over navigable waters and therefore inapplicable to the Desert Land Act, which applied by its terms only to non-navigable waters. As we noted *supra* at n.79, the federal government's authority to preserve the navigability of streams is not a source of federal power, but rather an example of federal power that can be exercised under the Commerce Clause Therefore, the Court's comments would be equally applicable if some other constitutional power—for example the Property or General Welfare Clauses—were the basis of the United States' attempt to enjoin diversion of the river by private appropriators. In any event, the Court's comments were directed not at state-approved diversions of navigable waters, but state-approved diversions of non-navigable waters, waters that are clearly within the scope of the Desert Land Act

369

interpretation of the term "public lands" in the Desert Land Act to include only public domain lands—*i.e.*, those open for settlement and disposition. *See* p. 27 *supra*. The Act therefore did not apply to reserved lands. At the time of the Court's decision, because the federal reservation in question had been made subsequent to passage of the Act, the relevant public domain was not the public domain as of the time the Act was passed, but the public domain as of 1954. The Court's decision has consistently been interpreted to mean therefore that the federal government can withdraw unappropriated water from the state appropriation system at any time by withdrawing appurtenant lands from the public domain for a particular federal purpose. *See, e.g., Cappaert* v. *United States, supra,* 426 U.S. at 145; Morreale, "Federal-State Conflicts," *supra* n.17, at 432.

The basis upon which the federal government can make such a withdrawal is not clear from the Court's discussion in *Federal Power Commission* v. *Oregon,* 349 U.S. 435 (1955). Commentators have suggested that the appropriate analysis is repeal-by-implication. The argument is that, although Congress granted the states plenary authority over unappropriated water within their borders by the 1866, 1870, and 1877 Acts (including authority over federal uses), the subsequent reservation of land for a specific federal purpose impliedly repeals those acts to the extent of the water rights involved. *See, e.g.,* Grow & Stewart, *supra* n.36, at 466–67. That argument is subject, however, to the serious objection that implied repeals are highly disfavored, particularly as many reservations may be made simply by executive order or administrative action. *See, e.g., TVA* v. *Hill,* 437 U.S. 153, 189–90 (1978); C. Sands, *Statutes and Statutory Construction,* § 23.09 (4th ed. 1973). We believe that the more tenable explanation is that the Acts gave the states authority only to control and administer *private* rights to water on federally owned lands, and did not grant away the federal government's power, if properly and clearly exercised, to use unappropriated water on federal lands without regard to state law. The significance of a reservation of land from the public domain is not that it repeals the effect of the Mining Acts or Desert Land Act, but that it is an exercise by Congress of that power and therefore, by reason of the Supremacy Clause, preempts inconsistent state control of federal uses.

## B. Statutory Basis for Federal Claims

Although we do not believe that Congress ceded its regulatory authority over federal use of unappropriated water on federal lands to the western states by the Mining Acts and the Desert Land Act, Congress clearly recognized and indeed fostered, by those acts and subsequent land management statutes, the development of comprehensive state water codes and administrative systems applicable to unappropriated water on federal, as well as privately or state-owned land. It is clear that federal law may displace those state systems, however, at least with respect to unappropriated water on federal lands. *See, e.g., United States* v. *Rio*

*Grande Dam & Irrigation Co., supra.* What is not clear—and what we address here—is *when* and *how* federal law displaces state water law.

Because Congress has seldom directly regulated the acquisition or use of water by federal agencies or their licensees,[90] and has not enacted comprehensive legislation dealing with federal water rights in the western states,[91] the federal state conflicts that are of primary concern are conflicts between federal uses of water for the management of federal lands and state substantive or procedural law. For example, state law may not recognize certain federal uses as beneficial or in the public interest[92] or may deny a priority date to a federal use because of the

---

[90] Exceptions include certain provisions of the reclamation laws, such as § 5 and § 8 of the Reclamation Act of 1902 and § 9 of the Reclamation Project Act of 1939, which prescribe terms upon which the Secretary of the Interior can use or dispose of water from federal reclamation projects (*see* pp. 22–23 *supra*); § 9 of the Rivers and Harbors Act of 1899, 33 U.S C. § 401, which requires the consent of Congress to construct dams and other obstructions on navigable waters, and the Federal Power Act, *supra* n.28, which provides for licensing of hydroelectric dams on navigable and some other waters (*see* p 23 *supra*).

[91] In the last 30 years, a number of "water rights settlement bills" have been introduced into Congress but have not been passed. For the most part, these bills would have given the states considerable control over federal uses of unappropriated water The "Barrett bill," introduced in 1956, for example, would have provided that:

> [A]ll navigable and non-navigable waters are hereby reserved for appropriation and use of the public pursuant to State law, and rights to the use of such waters for beneficial purposes shall be acquired under State laws relating to the appropriation, control, use, and distribution of such waters. Federal agencies and permittees, licensees, and employees of the Government, in the use of water for any purpose in connection with Federal programs, projects, activities, licenses, or permits, shall, as a condition precedent to the use of any such water, acquire rights to the use thereof in conformity with State laws and procedures relating to the control, appropriation, use, or distribution of such water.

S 863, 84th Cong , 2d Sess § 6 (1956), *reprinted in* Morreale, "Federal-State Conflicts," *supra* n.17, at 514 The "Kuchel bill," introduced in the 88th Congress, provided that

> Any right claimed by the United States to the beneficial diversion, storage, distribution, or consumptive use of water under the laws of any State shall be initiated and perfected in accordance with the procedures established by the laws of that State.

S. 1275, 88th Cong., 1st Sess § 3 (1962), *reprinted in* Morreale, "Federal-State Conflicts," *supra* n.17, at 494. Sponsors of bills granting control over water resources to the states generally have argued that such provisions would merely "confirm" the *status quo*. *See id* at 446. Hearings were held on various aspects of federal-state relations in the field of water rights in 1950, 1956, 1960–61, and 1964. *See Water Rights Settlement Act: Hearings on S 863 Before the Subcomm on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs,* 84th Cong., 2d Sess. (1956); *Water Rights Settlement Act of 1956. Hearings Before the House Comm. on Interior and Insular Affairs,* 84th Cong , 2d Sess (1956); *Federal-State Relations in the Field of Water Rights: Hearings Before the Subcomm on Irrigation and Reclamation of the House Comm on Interior and Insular Affairs,* 86th Cong., 1st Sess (1959), *Federal-State Water Rights: Hearings Before the Senate Comm. on Interior and Insular Affairs,* 87th Cong., 1st Sess. (1961), *Federal-State Water Rights· Hearings on S. 1275 Before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs,* 88th Cong , 2d Sess. (1964) For a detailed discussion of various water rights settlement bills, *see* Morreale, "Federal-State Conflicts," *supra* n.17, and 2 Clark, *supra,* § 107.

In 1973, the National Water Commission proposed a "National Water Rights Procedure Act," which would have required federal agencies to proceed in conformity with state laws and procedures relating to the appropriation or use of water and the administration and protection of water rights, except "where state law would conflict with the accomplishment of the purposes of a federal program or project " The Act would also have established a procedure for recording and quantifying existing non-Indian federal water uses and would have eliminated the non-compensation features of the reserved right doctrine and the navigation servitude *See* National Water Commission, *Water Policies for the Future* (Water Information Center, Inc. 1973), at 461–64.

[92] The Forest Service has expressed concern in the past, for example, that it might not be able to obtain state recognized rights for certain instream or in-situ uses such as livestock watering, recreation, or preservation of fish and wildlife, because applicable state law requires a diversion of water or does not recognize such uses as beneficial *See* Department of Agriculture Position Statement, submitted to Office of Legal Counsel on Nov. 5, 1981. An analogous problem has been identified by the Department of the Army with respect to water rights available for Fort Carson, in Colorado, which is located on acquired federal lands Concerns have been raised by the Army that Colorado law would not recognize the uses of water for military training and emergency preparedness. *See* Department of the Army, Legal Memorandum, "Federal Non-Reserved Water Rights" (Nov. 5, 1981).

371

failure of the agency to comply with state procedural or permitting require-ments.[93] The question, therefore, is whether, by authorizing certain uses of federal lands, Congress intended also to authorize acquisition of water for those uses without regard to limitations imposed by state law. As the Supreme Court commented in *New Mexico* with respect to federal reserved rights, this "is a question of *implied intent* and not power." 438 U.S. at 698 (emphasis added).

Under the federal non-reserved right theory articulated by Solicitor Krulitz, the requisite intent to displace state control over the appropriation of unappropri-ated water could be inferred merely from Congress' authorization to federal agencies to manage federal lands; no specific congressional intent to displace state control over water would need to be shown. Thus, for example, a federal agency would be entitled to water necessary for preservation of minimum instream flows for stock watering, recreation, and fish and wildlife purposes whether or not state law recognized such uses as beneficial, and would not be bound by state permitting or other procedural requirements, so long as the agency was acting within its congressionally mandated authority. The contrary view is that, unless Congress has set specific conditions on the acquisition or use of water by federal agencies or has reserved the underlying land, federal agencies are limited to water rights obtainable under state substantive and procedural law. If, for example, applicable state law does not recognize minimum instream flows, Congress has not explicitly recognized a federal right to those flows, and the agency cannot claim an implied reserved right to such flows because the underly-ing land was not reserved from the public domain or the use is not a primary purpose of a reservation, the agency is not entitled to that water.[94] Similarly, except when the agency may be able to assert reserved rights (which have a priority date based on the date the land was reserved), the priority date of its water rights must be established in accordance with state substantive and procedural law.

As both Solicitor Krulitz and Solicitor Coldiron recognized, the Supreme Court's decisions in *California* v. *United States* and *United States* v. *New Mexico* are highly relevant to an analysis of the federal non-reserved water rights theory, both because those decisions are the most recent pronouncements of the Supreme Court on federal rights to unappropriated water in the western states and because the Court suggested in those opinions that there may be limitations on the federal government's ability to acquire or use water on federal lands without complying with applicable state laws. It is important to understand, however, that the

---

[93] In many cases federal agencies have failed to apply for permits recognizing state appropriative rights at the time the water was first put to use because of inadvertence, policy decisions, or legal advice In "permit" states, which award priority based on the date an application is filed, those agencies risk having their rights cut off by a junior appropriator who has complied with state procedural requirements. Assertion of federal non-reserved rights, if sustained, would allow the federal agencies to antedate their water rights—*i e.,* to get the benefit of a priority date based on the first actual use of the water

[94] The western states have argued that in those states that do not recognize minimum instream flows, the flows may nevertheless be preserved by the acquisition (by purchase or condemnation) and exercise of senior downstream state-awarded water rights, which will ensure the continued upstream flows. *See* Memorandum to Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, from the Honorable Mike Greely, Attorney General, State of Montana (Apr 1, 1982).

holdings in those decisions were relatively narrow, limited to the effect of § 8 of the Reclamation Act of 1902 (*California* v. *United States*) and the scope of the Forest Service's reserved rights under its Organic Administration Act (*United States* v. *New Mexico*). Unfortunately, much of the debate about the meaning of *California* and *New Mexico* focuses on isolated language used by the Court, which is interpreted by critics of the non-reserved right theory to preclude assertion of any federal non-reserved rights and by proponents of the theory as limited to the narrow holdings in the cases before the Court. As we discuss now, both interpretations of the Court's language are selective and do not provide an entirely satisfactory rationale for either conclusion.

Critics of the non-reserved right theory argue that, in the following three passages from *California* and *New Mexico,* the Court definitively disposed of the contention that any federal non-reserved water rights exist:

> The Court noted [in *United States* v. *Rio Grande Dam & Irrigation Co.*] that there are two limitations to the State's exclusive control of its streams—reserved rights "so far at least as may be necessary for the beneficial uses of the government property," and the navigation servitude. The Court, however, was careful to emphasize with respect to these limitations on the States' power that, except where the reserved rights or navigation servitude of the United States are invoked, the State has total authority over its internal waters.

*California* v. *United States, supra,* 438 U.S. at 662 (citations omitted).

> Where water is only valuable for a secondary use of the reservation . . . there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator.

*United States* v. *New Mexico, supra,* 438 U.S. at 702.

> [T]he "reserved rights doctrine" is a doctrine built on implication and is an exception to Congress' explicit deference to state water law in other areas.

*Id.* at 715.

None of these statements, however, can be interpreted as conclusively as critics of the non-reserved rights theory urge, when read in context.[95] In the language

---

[95] Solicitor Coldiron concluded in his opinion that "this issue of 'non-reserved' federal water rights was definitively and directly addressed on July 3, 1978, by the Supreme Court in two separate opinions regarding the water rights of the United States [*United States* v *New Mexico* and *California* v. *United States*] " Coldiron Op at 9. The western states, relying primarily on the "contrary inference" language from *New Mexico,* argue that "*New Mexico* dictates that when the federal government claims water for a national forest (assuming the navigation servitude does not apply), it has only two mechanisms available to it. the reserved rights doctrine or the law of the state in which the reservation is located " *See* Memorandum to Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, from the Honorable Mike Greely, Attorney General of Montana (Apr 1, 1982) at 8–9

quoted from *California*, for example, the Court was merely characterizing its holding in the *Rio Grande* case.[96] The Court clearly recognized in the remainder of its opinion that there may be circumstances other than the navigation servitude or reserved rights doctrine under which a federal statute would preempt the state's exclusive control of its stream—*i.e.*, if conditions imposed by state law on the operation or construction of a federal reclamation project are "inconsistent with clear congressional directives respecting the project." *See* 438 U.S. at 672. Consequently, the Court could not have intended, by that language, to establish a rule of law applicable to all water rights that could be asserted by the federal government.

Likewise, the often-cited language in *New Mexico* that a "contrary inference" arises that the United States must acquire water "in the same manner as any other public or private appropriator," if reserved rights are not available, must be considered in context. The only issue before the Court in *New Mexico* was the scope of the Forest Service's reserved rights under its Organic Administration Act.[97] The Court did not have before it any argument or evidence relevant to rights that might have been asserted by the Forest Service on some other basis, such as appropriation under state law, or relevant to rights arising on public domain lands. Thus, the Court's statement about the ability of the Forest Service to obtain water in excess of its reserved rights was made only in the context of federal reserved lands; as we discuss *infra*, even with respect to reserved lands it can be argued that the language does not mean that federal agencies are necessarily bound by state law in acquiring water necessary only for "secondary" uses of the land. *See* p. 68 *infra*.

Finally, the Court's characterization of the reserved rights doctrine as an "exception" to Congress' explicit deference to state water law in other areas does not imply that reserved rights are the *only* exception. The Court clearly recognized in *California*, as we have discussed, that other exceptions may exist. *See* Part IIB(3)(b) *supra*.

While we believe that these selected passages from *California* and *New Mexico* do not therefore definitively dispose of the federal non-reserved water rights theory, we believe that they reflect the Court's view and its interpretation of Congress' intent over the years that substantial deference will be accorded to state water laws. We do not believe, therefore, that the decisions should be read as narrowly as has been suggested by proponents of the non-reserved theory. Solicitor Krulitz, for example, argued that when the Court suggested in *New*

---

[96] Arguably, this construction mischaracterizes the scope of the language used in *Rio Grande*, which was that a state cannot "destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters; so far at least as may be necessary for the beneficial uses of the government property." 174 U S. at 703. It was not until nine years later, in *Winters* v. *United States*, *supra*, that the Court first used the term "reserved" rights to describe federal water rights Furthermore, the Court's holding in *Rio Grande* rested on the federal government's navigation power under the Commerce Clause Hence its holding is somewhat narrower than was described in *California* v. *United States*.

[97] The Court defined the question before it as "what quantity of water, if any, the United States reserved out of the Rio Mimbres when it set aside the Gila National Forest in 1899." 438 U S at 698. The briefs before the Court dealt only with the scope of reserved rights available under the Forest Service's Organic Administration Act, no evidence or argument was advanced to indicate that the Forest Service would not be able to acquire water necessary for the management of the national forests under applicable state law, if it did not have reserved rights to that water.

*Mexico* that, absent a reserved right the Forest Service should acquire water rights "in the same manner" as other appropriators, it intended only to draw a distinction between the rights that could be obtained by a reservation of land (which have priority as of the date of the reservation and are measured by reasonable present and future uses of the land) and rights obtained by appropriation (which have priority as of the date of actual use and are measured by the extent of that use). That is, when the Court stated that federal agencies must acquire water for secondary uses of federal reservations "in the same manner" as other appropriators, it meant only that the right must be acquired through "appropriation," or actual use of the water, rather than by "reservation" of the land. If a federal agency had actually appropriated water to fulfill an authorized agency function, Krulitz concluded that the Court would not hold that a state, by application of its substantive or procedural law, could deny a right to that water to the agency. *See* Krulitz Op. at 577.

While there is evidence to suggest that the Court was concerned with the possibility that reserved rights could cut off the rights of private appropriators because of their senior priority date,[98] we believe that the Court intended "in the same manner as any other public or private appropriator" to mean "under applicable state law." On three occasions, the Court referred expressly to congressional intent that water be acquired under state law. In the sentence immediately following the language quoted above, for example, the Court remarked that "Congress *indeed* has appropriated funds for the acquisition *under state law* of water to be used in federal reservations." 438 U.S. at 702 (emphasis added). Similarly, the Court noted that "[t]he agencies responsible for administering the federal reservations have also recognized Congress' intent *to acquire under state law* any water not essential to the specific purposes of the reservation," and that "the 'reserved rights doctrine' is a doctrine built on implication and is an exception to Congress' explicit deference *to state water law* in other areas." *Id.* at 703, 715 (emphasis added). Thus, the most logical reading of the Court's language is that water that is not necessary to carry out the particular primary purposes mandated by Congress for the federal reservation in question must be acquired in compliance with applicable state substantive and procedural law.[99]

With respect to the effect of *California* v. *United States*, Solicitor Krulitz argued that the Court's recognition that state law must fall if "inconsistent" with congressional directives supports the federal non-reserved rights theory. Krulitz

---

[98] The Court noted that "[w]hen, as m the case of the Rio Mimbres, a river is fully appropriated, federal reserved water rights will frequently require a gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators" and suggested that "[t]his reality has not escaped the attention of Congress and must be weighed in determining what, if any, water Congress reserved for use in the national forests." 438 U.S at 705

[99] It could be argued that the Court meant only that federal agencies should comply with state *procedural* law in the filing of claims or applications for water rights, but would not be bound by limitations imposed by state substantive law on water rights to carry out secondary uses of the reservation. The Court did not, however, draw any distinction between substantive and procedural law in its discussion. Moreover, the Court rejected a similar argument in *California* v *United States* with respect to the language of § 8 of the Reclamation Act, stating that limiting the effect of § 8 to compliance with only the form of state water law "would trivialize the broad language and purpose of § 8." 438 U S. at 675

375

Op. at 576. This argument requires that we construe the mere assignment of a land management function or delegation of responsibility for construction and operation of a federal project to a federal agency as a "congressional directive" within the Court's meaning. If so, any state laws or conditions that would prohibit the acquisition of water to carry out those responsibilities would fall.

Because the Court in *California* remanded the proceedings for a determination of whether the conditions imposed by *California* on the New Melones Dam would be "inconsistent" with authorization of the dam, it is difficult to speculate as to the type of conditions the Court would have found impermissible. Plainly, if a state-imposed condition would make the entire project impossible, it would be struck down. *See First Iowa Cooperative* v. *Federal Power Commission*, 328 U.S. 152 (1946). If Congress specifically authorized construction of a dam of a certain size, placed express conditions on the use of water from the dam, or prescribed particular uses or purposes of the project, it is relatively clear that state-imposed conditions that are inconsistent with those provisions would be preempted. *See, e.g., California* v. *United States, supra*, 438 U.S. at 669 n.21; *Ivanhoe Irrigation District* v. *McCracken, supra*, and *City of Fresno* v. *California, supra*. However, we do not believe the Court intended that *any* conditions that might interfere with construction or operation of the project must fall. Such an interpretation would be inconsistent with the Court's analysis in *New Mexico*, in which the Court contemplated that state law might control some aspects of the operation of federal lands. We believe that, read in context and in light of *New Mexico*, the Court contemplated in *California* that "inconsistent" state conditions include those, for example, that would conflict with explicit statutory provisions directing a federal agency to acquire or dispose of water under certain conditions or limitations (such as the provisions of the reclamation laws discussed in *Ivanhoe, Fresno*, and *Arizona* v. *California*), conditions, or specifications established by Congress in the authorizing legislation for a federal project, or conditions that would entirely frustrate the purposes for which the project was authorized. This leaves open the possibility, for example, that the state may place conditions on secondary, or incidental, features of the project, or may impose conditions, for state purposes, that do not frustrate the specific federal purposes for which the project or management of the lands was authorized.

The primary importance of the Court's decisions in *California* and *New Mexico* to the federal non-reserved right theory lies in the Court's mode of analysis, particularly in the significance attributed by the Court to Congress' history of deference to state water law. As we discussed above, the constitutional basis for federal water rights, however denominated, is the Supremacy Clause coupled with a proper exercise of federal authority. Therefore the issues addressed by the Court in *California* and *New Mexico* are precisely those which must be addressed whenever federal water rights are asserted, whether the asserted rights arise under the Reclamation Act of 1902, the Forest Service's Organic Administration Act, or some other federal land management statute. The issues are (1) in an exercise of a constitutional grant of power, did Congress intend to preempt state laws governing the acquisition and use of unappropriated

water within the western states? and (2) if so, what is the scope of that preemption?

The Supreme Court made it clear in *California* and *New Mexico* that the existence of federal water rights depends on a finding of congressional intent to preempt state water law. That congressional intent cannot be analyzed without consideration of Congress' overall role in the development of water law in the western states and the importance to the western states of control over scarce water resources. The Court found the most significant aspect of Congress' role to be a negative one—*i.e.*, Congress' general deference to and acquiescence in the development of comprehensive water codes by the western states. For example, in *California* the Court interpreted the Reclamation Act of 1902 not only in light of its unique legislative history, but also in light of "the consistent thread of purposeful and continued deference to state water law by Congress." 438 U.S. at 653. In *New Mexico*, both the majority and the dissent agreed that the determination of reserved rights under a particular statutory scheme, such as the Forest Service's, requires a "careful examination" of the asserted right and the specific purpose for which the land was reserved, "both because the reservation [of water] is implied, rather than expressed, and because of the history of congressional intent in the field of federal-state jurisdiction with respect to allocation of water." 438 U.S. at 701–02; *see also id.* at 718 (Powell, J., dissenting).

The deference to state water law found relevant by the Court includes both specific instances in which Congress directed federal agencies to abide by state water law, such as § 8 of the 1902 Reclamation Act and—perhaps more importantly—Congress' acquiescence in the development by the states of comprehensive procedural and substantive codes to recognize and enforce private rights to water, including water on federal lands. The significance of statutes such as the Mining Acts of 1866 and 1870, the Desert Land Act of 1877, the Reclamation Act of 1902, and the McCarran Amendment is thus not that they directly regulate federal uses of water, but that they demonstrate Congress' recognition that the allocation of water within the western states is primarily a matter of concern to the states, rather than a subject for uniform comprehensive federal regulation. *See United States v. New Mexico, supra,* 438 U.S. at 702 & n.5. Although Congress may in specific instances create federal water rights that do not depend on state law, such rights must be seen as the exception, rather than the rule, particularly as they could substantially disrupt or disturb expectations of private appropriators under existing state systems. *See United States v. New Mexico, supra,* 438 U.S. at 715.

The effect of Congress' deference to state water law can best be understood as establishing a "presumption" to be read into the language and legislative history of federal statutes that authorize the management of federal lands—*i.e.*, that in the absence of evidence to the contrary, it will be presumed that Congress did not intend to alter or affect its policy of deference to state water law. Therefore, as a general rule, it will be assumed that Congress intended federal agencies to acquire water rights in accordance with state law and contemplated that a state

could deny some federal uses of water. This is squarely inconsistent with the non-reserved water rights theory advanced by Solicitor Krulitz.

Solicitor Krulitz argued that the presumption of deference to state law is an unwarranted exception to the established doctrine that "federal activities are immune from state regulation unless there is a 'clear congressional mandate,' or 'specific congressional action.'" Krulitz Op. at 564 (citations omitted). The cases relied upon by Solicitor Krulitz in support of this argument, however, involve federal statutory schemes that are ill-adapted to state law,[100] or state statutes that operate to frustrate specific federal purposes.[101] If we look at other areas in which the Court has recognized that state rules may apply to federal programs, it is clear that the approach taken and result reached by the Court in *California* and *New Mexico* are not aberrations, but rather are consistent with the approach of the Court in those areas.

The Court's recent decision in *United States* v. *Kimbell Foods, Inc.,* 440 U.S. 715 (1979), is particularly instructive. In that case, the Court considered whether contractual liens arising from certain federal loan programs take precedence over private liens established under state commercial laws. The federal statutes in question, the Small Business Act and the Federal Housing Act, authorized federal agencies to secure certain loans and provided for liens arising out of those loans, but did not establish any priority for the liens. Analyzing the question as one of "federal common law,"[102] the Court refused to fashion specific federal rules governing the relative priority of private liens and liens arising under the government's lending program; it held that priorities should be determined under applicable state laws. The Court recognized that federal law governed the rights of the United States arising under the loan programs, because the lending agencies derived their authority from specific acts of Congress passed in the exercise of a constitutional power and "their rights, [therefore] should derive from a federal source," but held that application of federal law does not require, in every instance, the creation of uniform federal rules. 440 U.S. at 726, 728.[103]

---

[100] *See, e.g., Hancock* v. *Train,* 426 U S 167 (1976) (Clean Air Act); *EPA* v. *State Water Resources Control Board,* 426 U S. 200 (1976) (Clean Water Act); *Kleppe* v *New Mexico,* 426 U S. 529 (1976) (Wild Free-Roaming Horses and Burros Act).

[101] *See, e.g , United States* v *Little Lake Misere Land Co.,* 412 U.S. 580, 597 (1973) (Louisiana statute governing mineral rights in land conveyance to the United States is "hostile" to federal interests under the Migratory Bird Conservation Act and discriminates against federal interests).

[102] The Supreme Court has generally not characterized questions of federal water rights as involving federal common law *See, e.g., United States* v *New Mexico, supra, but see Hinderlider* v. *LaPlata River & Cherry Creek Ditch Co.,* 304 U S. 92 (1938) (federal common law applied to reverse a decision of the Colorado Supreme Court concerning the appropriation of water in an interstate stream). However, as at least two commentators have noted, the analogy is apt. *See* Grow & Stewart, *supra* n.36; Note, "Federal Nonreserved Water Rights," 48 U. Chi. L. Rev. 758 (1981) That is, the task undertaken by the courts in the name of federal common law is to fill interstices left by congressional authorization of a federal program that fails to deal specifically or comprehensively with rights and liabilities that may arise under that program *See Clearfield Trust Co* v. *United States,* 318 U.S. 363, 367 (1943) ("In the absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards"); *see generally* P. Bator, P Mishkin, D Shapiro, and H. Wechsler, *The Federal Courts and the Federal System,* 691–708 (2d ed. 1973). An analysis of federal water rights similarly requires the courts or administrative agencies to determine what rules should apply to water necessary to carry out congressionally authorized programs, where Congress has expressly authorized only the use of the underlying land

[103] The Court's use of the term "federal law" in this context connotes only that the federal judiciary is competent to determine rights arising under the federal programs *See* 440 U.S. at 727

378

In some cases, federal law may require no more than the adoption or borrowing of rules created by state law:

> Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy "dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law."

440 U.S. at 728, quoting *United States* v. *Standard Oil Co.*, 332 U.S. 301, 310 (1947); *see also United States* v. *Little Lake Misere Land Co.*, *supra*, 412 U.S. at 594–95.

The Court identified three considerations relevant to the choice of federal or state rules:

> (1) the need, if any, for uniform nationwide rules governing implementation or administration of federal programs;
> (2) the extent to which application of state law would frustrate specific objectives of the federal program; and
> (3) the extent to which application of a federal rule would disrupt relationships predicated on state law.

*See* 440 U.S. at 728–29. In the circumstances presented in *Kimbell*, the Court concluded that none of these considerations required fashioning of specific federal rules governing the priority of liens under the SBA or FHA.

The Court's reasoning in *Kimbell* is analogous in several respects to its reasoning in *California* and *New Mexico*. For example, in rejecting the government's contention that administration of the SBA and FHA programs required a uniform national rule of priority, the Court found it significant that the practice and policies of the responsible agencies in administering the loan programs were in many respects adapted to state law, with apparently little disruptive effect on the accomplishment of the goals of the program. *See* 440 U.S. at 730–33. Similarly, in *California* and *New Mexico*, the Court found it relevant that the Bureau of Reclamation and the Forest Service had in the past conformed their acquisition of water rights to state law as a matter of administrative practice and interpretation. *See California* v. *United States*, *supra*, 438 U.S. at 675–76; *United States* v. *New Mexico*, *supra*, 438 U.S. at 717 n.24. In *Kimbell*, as in *New Mexico* and *California*, the Court recognized that creation of special federal rules would substantially disrupt expectations built on established state law. The Court's comments in *Kimbell* in that regard are equally applicable to the potentially disruptive effect of federal water rights that could be asserted without regard to state substantive or procedural law:

> In structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved. However, subjecting federal contractual liens to the doctrines developed in the lien area

379

[giving such liens priority] could undermine that stability. Cred-
itors who justifiably rely on state law to obtain superior liens
would have their expectations thwarted whenever a federal con-
tractual security interest suddenly appeared and took precedence.

440 U.S. at 739 (citations omitted).

Most importantly, the Court indicated in *Kimbell* that it would be willing to
fashion special federal rules of priority only if application of state rules would
frustrate the specific purposes for which Congress had authorized the loan
programs. The Court concluded that the interest of the United States as a "quasi-
commercial lender" did not require the same sort of extraordinary priority that
had been accorded other liens created under federal programs, such as tax liens,
which are intended to secure adequate revenues in order that the United States can
discharge its obligations. In reaching this conclusion, the Court found it highly
relevant that Congress had recognized by statute that state claims may in some
instances have priority even over federal tax liens:

> We do not suggest that Congress' actions in the tax lien area
> control our choice of law in the commercial context. But in
> fashioning federal principles to govern areas left open by Con-
> gress, our function is to effectuate congressional policy. To ignore
> Congress' disapproval of unrestricted federal priority in an area as
> important to the Nation's stability as taxation would be inconsist-
> ent with this function.

440 U.S. at 738 (citations omitted). The significance attributed by the Court to
such expressions of congressional policy and its unwillingness to create federal
rules of priority absent a showing that application of state rules will frustrate
specific federal interests echoes the reasoning of the Court in both *California* and
*New Mexico*. Thus, where application of state law will not frustrate specific
federal purposes or interests, where the federal program has been and can be
adopted to state law, and where implication of federal rights would substantially
disrupt expectations of private individuals based upon an existing comprehensive
state regulatory scheme, the teaching of *Kimbell, California,* and *New Mexico* is
that state law may control federal rights and liabilities arising under federal
programs.

The next step of the analysis is to determine whether, in a particular statutory
scheme authorizing the management of federal lands or federal water projects,
Congress intended to carve out an exception in that instance to its general policy
of deference to state water law. This is precisely what the Court did in *California*
and *New Mexico*. In both cases, the Court looked in detail, on a case-by-case
basis, at the statutes in question and their legislative history to determine whether,
or under what circumstances, Congress intended that the Bureau of Reclamation
or the Forest Service could use water without regard to state water laws.

Because *California* and *New Mexico* dealt only with two particular statutes,
they do not provide a definitive answer as to federal rights that can be asserted

380

under other statutes. That determination can be made only by examining each statute in light of its legislative history and the possible conflicts that could be created by application of state law. Nonetheless, the Court's reasoning in *New Mexico* and *California* provides the relevant framework for that examination.

We believe that *California* and *New Mexico* must be read to limit the bases upon which federal water rights may be asserted without regard to state law to specific congressional directives or authorizations that override inconsistent state law, and the establishment of primary purposes for the management of federal lands or construction and operation of federal projects that would be frustrated by the application of state law. As we noted *supra,* we believe that specific congressional directives must be construed narrowly, and do not include all authorized functions or uses of federal property. The clearest example of such directives would be provisions that place express limitations or conditions on the use or distribution of water from federal projects or express conditions or specifications included in congressional authorizations of federal projects. In the abstract, pending clarification by the Court of its holding in *California,* however, it is difficult for us to provide more detailed guidance.

The determination of whether there has been a sufficient manifestation of federal power in order to invoke the Supremacy Clause is difficult to make in the abstract, and may be clarified only through administrative interpretation or litigation. The starting point, however, is unquestionably the content and the context of the act, usually a statute, but occasionally an executive order, expressing the exercise of a constitutional federal power. As we have discussed above, the Court's analysis of federal-state conflicts in other areas may provide some guidance in determining the validity of the exercise of the power. In particular, the Court has found relevant such factors as: the extent to which federal programs can be or have been adapted to state law;[104] the role played by the federal government, the significance of the federal interests at stake, and the risk to federal goals and interests posed by application of state law;[105] and the extent to which application of federal rules will disrupt private expectations.[106] *See United States* v. *Kimbell Foods, Inc., supra,* 440 U.S. at 728–29; *Wilson* v. *Omaha Indian Tribe,* 442 U.S. 653, 671–74 (1979). These factors, together with the legislative history of the statute in question, must be weighed in determining the basis for federal water rights.

We do not view the Court's discussion in *New Mexico* of primary purposes and secondary uses as necessarily limited to federal lands that have been formally withdrawn from the public domain. We believe, for example, that the implied right analysis used by the Court in *New Mexico* and other reserved right cases supports a parallel implication on "acquired" lands that have been set aside for specific federal purposes, for example, national forest lands acquired under the

---

[104] *See, e g., United States* v. *Yazell,* 382 U S 341, 354–57 (1966), *United States* v *Standard Oil Co.,* 332 U.S. 301, 311 (1947)

[105] *See, e g., RFC* v *Beaver County,* 328 U.S. 204, 209–10 (1946), *United States* v *Little Lake Misere Land Co., supra* n 101, 412 U.S at 595–97, *United States* v. *Yazell, supra* n 104, 382 U S. at 352–53

[106] *See, e.g., United States* v *Brosnan,* 363 U S. 237, 241–42 (1960), *Wallis* v *Pan American Petroleum Corp,* 384 U S 63, 68 (1966)

provisions of the Weeks Act, 16 U.S.C. § 515.[107] Much of the language used by the Court to describe the scope of the reservation doctrine, in fact, is broad enough to cover all lands set aside for a particular federal purpose, regardless of the prior ownership of the land. For example, in *Arizona* v. *California, supra,* in which the Court recognized that the reserved right doctrine applies to non-Indian lands, the Court agreed with the conclusion of the Master "that the principle underlying the reservation of water rights for Indian Reservations was equally applicable to *other federal establishments* such as National Recreation Areas and National Forests." 373 U.S. at 601 (emphasis added). In *Cappaert* v. *United States, supra,* the Court noted that the reserved right doctrine "applies to Indian reservations and *other federal enclaves.*" 426 U.S. at 138 (emphasis added). Finally, in *New Mexico,* the Court did not suggest that the reserved right doctrine applies only to lands that may be formally reserved from the public domain; it recognized rather that the doctrine applies to any land that has been set aside as a national forest (which could be reserved or acquired lands). *See* 438 U.S. at 698–99.[108]

Similarly, we believe that Congress could establish "primary purposes" for the management of public domain lands that could be the basis for federal water rights. As we have noted, the reservation of land for a federal purpose does not, in and of itself, create federal water rights. It is rather the specification of particular purposes for which the lands should be maintained and managed and the implicit intent that water be available for those purposes that give rise to those rights.[109] It may be possible to argue, therefore, that in the relevant statutes Congress intended that the public domain be managed for specific purposes that cannot be accomplished without implication of federal water rights.[110] However, as Solicitor Martz concluded, given the language and legislative history of the Taylor Grazing Act and FLPMA, it is highly doubtful that those statutes could be read to reflect the requisite congressional intent to displace existing state water laws. *See*

---

[107] The implied water rights that could be asserted on acquired federal lands that have been, in effect, "withdrawn" from the public domain under a particular statutory scheme would theoretically be the same in all respects as reserved rights that could be asserted under that scheme, unless the *statute itself sets out different* purposes or different conditions for the use of acquired lands Most importantly, a priority date for implied water rights on such acquired lands could be asserted based on the date the lands were set aside for federal purposes, whether or not the water was actually put to use at that time However, we understand that, in general, priority dates for water rights on acquired lands have been claimed in the past only based on the date of first use. As a matter of policy, federal agencies could, of course, continue to assert priority for water rights on acquired lands based on the date of first use, in order to minimize dislocation or disruption of state and private expectations

[108] The forest lands comprising the Gila National Forest were, insofar as we are aware, all reserved lands As we pointed out in Part IIB(1) *supra,* in other contexts the Supreme Court and lower federal courts have generally recognized a clear distinction between lands that are open to acquisition, use, and settlement under the public land statutes and lands that have been set aside for particular federal purposes, including lands acquired or reacquired from private ownership.

[109] The reservation of land, however, may be probative evidence of congressional intent, because it demonstrates that Congress intended that the land should be managed for particular purposes *to the exclusion of other purposes*—a showing which would buttress the argument that Congress did not contemplate that state law could defeat those purposes.

[110] Nothing in the recent decision in *Sierra Club* v *Watt,* 659 F.2d 203 (D.C Cir 1981), in which the court held that no federal reserved rights could be created under FLPMA, necessarily precludes this argument, because the court's conclusion rested only on whether the land in question had been withdrawn from the public domain Since it had not been withdrawn, the court found no reserved rights had been created The court did not consider whether, independent of the reserved rights doctrine, FLPMA provides a basis for other federal water rights 659 F.2d at 205

Martz Op. at 257–58; *see generally Sierra Club* v. *Watt*, 659 F.2d 203, 206 (D.C. Cir. 1981). While we believe it is theoretically possible for federal water rights to exist on public domain lands, such rights probably cannot be asserted under the current statutory schemes authorizing management of the public domain. We have not, however, undertaken an independent analysis of those statutes.

## IV. Conclusion

We conclude that the rationale of *California* and *New Mexico* must be applied to any assertion of federal water rights in the western states. To the extent the federal non-reserved water rights theory would suggest that federal water rights are created merely by the assignment of land management functions to a federal agency or authorization of a federal project, we believe that it does not have a sound legal or constitutional basis and does not provide an appropriate legal basis for assertion of water rights by federal agencies. *New Mexico* and *California* make it clear that the federal constitutional authority to preempt state water law must be clearly and specifically exercised, either expressly or by necessary implication. Otherwise, the presumption is that the western states retain control over the allocation of unappropriated water within their borders. Although we have not undertaken an independent analysis of the various federal land management statutes, we believe that, as a practical matter, because statutes authorizing management of the public domain probably do not provide a basis for assertion of federal water rights, the federal rights that can be asserted are limited to federal reserved rights and rights implied from specific congressional directives, if the concept of "reserved" rights is understood to apply as well to acquired federal lands that are part of a federal reservation. This does not mean that the federal government is helpless to acquire the water it needs to carry out its management functions on federal lands. If that water cannot be acquired under state law or by purchase or condemnation of existing rights, the remedy lies within the power of Congress. The Supremacy Clause provides Congress ample power, when coupled with the commerce power, the Property Clause, or other grants of federal power, to supersede state law. The exercise of such power must be explicit or clearly implied, however, and federal rights to water will not be found simply by virtue of the ownership, occupation, or use of federal land, without more.

The next logical step, to the extent it is necessary in order to apply this analysis to particular statutes, lands, or claims, is for the agencies with responsibility for enforcement and administration of the various land management statutes to review their statutory authority and water needs in light of the principles we have outlined here. We have not attempted that task here, because of its scope and because those agencies are more familiar with the scope and administration of those statutes and the possible problems presented by application of state law.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

383